State *vs.* Northern Central Railway Co.

Seeing no error in the rulings of the Court below, the judgment will be affirmed.

*Judgment affirmed.*

(Decided 2nd March, 1876.)

---

THE STATE OF MARYLAND *vs.* THE NORTHERN CENTRAL RAILWAY COMPANY. SAME *vs.* SAME.

*Consolidation of Railroad Companies—The Consolidated Company, a New corporation—Power of the Legislature under the Constitution of 1850, to Alter or Repeal the Charter of the Northern Central Railway Company—This power in no way affected by the adoption of the Constitutions of 1864 and 1867—The Charter of the Northern Central Railway Co. to be construed as if the Right to alter, amend or repeal it, had been reserved to the Legislature in the Charter itself— Not within the power of the Legislature to grant to the Northern Central Railway Co. immunity from Taxation, or any other corporate privilege, beyond the Power of. Repeal by a subsequent Legislature—Where the provisions of a General Act are inconsistent with the provisions of a prior Private Act, the Former must operate as a Repeal of the Latter— Validity of the Tax imposed by the Act of 1872, ch. 234, on the Gross receipts of the Northern Central Railway Co.— Such Tax not in conflict with Article 15 of the Bill of Rights.*

The Baltimore and Susquehanna Railroad Company was chartered by the Act of 1827, ch. 72, of Maryland, to construct a road from the City of Baltimore to the Susquehanna river. The charter was accepted, the company was organized, and the road constructed. The capital stock of the company was one

million of dollars, with power to increase it to two millions. By the 20th section of the Act of incorporation, it was provided that the shares of the capital stock of the said company should be deemed and considered personal estate, and should be exempt from the imposition of any tax or burthen. By the Act of 1854, ch. 250, the stockholders of the Baltimore and Susquehanna Railroad Company, were authorized to unite and consolidate their company or corporation, with three other railroad companies, lying within the State of Pennsylvania, so as to form one corporation to be called "The Northern Central Railway Company," on such terms and conditions, and conformably to such agreements and regulations as the said several companies might respectively determine and adopt, subject however to the following, among other conditions set forth in said Act: That all laws made in reference to the Baltimore and Susquehanna Railroad Company not repealed or modified by the Legislature of Maryland, should be binding and operative upon the said consolidated company, so far as its property or operations might be within said State, and so far as said laws might be applicable to, and consistent with, the new organization of the said consolidated company; that the said consolidated company should have the power to establish its capital stock to an amount not exceeding eight millions of dollars; that the said company should possess all the corporate powers and privileges, and be subject to all the duties and obligations not inconsistent with the Act and its general intent, which were expressed in the charter granted to the Baltimore and Susquehanna Railroad Company and its supplements. In pursuance of this Act and corresponding Acts of the Legislature of Pennsylvania conferring authority on the three corporations of that State, articles of union and consolidation were executed, by which all the property, rights, privileges and immunities belonging to the said several companies were transferred to, and became vested in, the body corporate formed by the consolidation. By section 47 of Article 3 of the Constitution of 1850, the Legislature could create no corporation by special Act except on condition that it should be subject to change, alteration or repeal. The Constitutions of 1864 and 1867, subsequently adopted, contained a similar provision. The Act of 1866, ch. 157, provided for the taxation of all property in the State, and repealed all laws exempting property from taxation By the Act of 1870, ch. 362, it was provided, "That all and every provision contained in the charter, or supplements thereto, of any railroad company incorporated by the laws of this State, or contained in any law heretofore passed by the Legislature of this State, whereby the stock, or property, real or personal, of any railroad company * * * * is exempted from taxation be and the same is hereby repealed." The Act of 1872, ch. 234, provided "that a State tax of one-half of one per centum be and the same is

State *vs.* Northern Central Railway Co.

hereby levied annually upon the gross receipts of all railroad companies worked by steam, incorporated by or under authority of the State, and doing business therein. In an action by the State to recover from the Northern Central Railway Company, a tax of one-half of one per cent., levied under the Act of 1872, ch. 234, on its gross receipts, for a part of the year 1872, and for the whole of 1873, from that part of its road lying within this State, and which formerly belonged to the Baltimore and Susquehanna Railroad Company, it was HELD:

1st. That although the corporate rights and privileges formerly belonging to the Baltimore and Susquehanna Railroad Company, were by the express terms of the Act of 1854, ch. 250, vested in the consolidated company, and the provisions of the Act of 1827, ch. 72, incorporating the original company, were to that extent embodied in, and re-enacted by, the said Act of 1854, ch 250, yet the rights and privileges thus conferred, became new and special grants to the consolidated company, dating from the period when the said Act of 1854 went into operation.

2nd. That the defendant was created a new corporation by virtue of the Act of 1854, and it was under that Act alone that it derived all its franchises, rights, privileges and immunities.

3rd. That as the Constitution of 1850 was in force when the Act of 1854, under which the defendant was incorporated, went into effect, the Legislature had the right to repeal or revoke the exemption from taxation claimed by the defendant under said Act.

4th. That as the power to alter or repeal the charter of the defendant was reserved to the State, under the Constitution of 1850, as fully as if such reservation had been set forth in express terms in the Act of incorporation, the right to exercise this power, could not in any manner be affected by the adoption of the Constitutions of 1864 and 1867.

5th. That the charter of the defendant must be construed as if the right to alter, amend or repeal it, had been reserved to the Legislature, by the express language of the charter itself.

6th. That it was not within the power of the Legislature, under the Constitution of the State, to grant to the defendant immunity from taxation, or any other corporate privilege, beyond the power of repeal or revocation by a subsequent Legislature.

7th. That the provisions of the Acts of 1866, ch. 157, 1870, ch. 362, and 1872, ch. 234, were repugnant to, and inconsistent with, the exemption from taxation claimed by the defendant under the Act of 1854, and as these several Acts could not stand together, the former must be considered as a repeal of the latter.

8th. That the tax imposed by the Act of 1872, ch. 234, upon the gross receipts of the defendant was a valid tax, and in nowise in conflict with Article 15 of the Bill of Rights, which requires that all taxation laid on property should be uniform and equal.

APPEALS from the Superior Court of Baltimore City.

These two suits were instituted by the appellant against the appellee—the one on the 6th of September, 1873, to recover a tax of one-half of one per cent. levied under the Act of 1872, ch. 234, on the gross receipts of the defendant from the 1st of April to the 31st of December, 1872, from that part of its road lying within the State of Maryland, and which formerly belonged to the Baltimore and Susquehanna Railroad Company ; the other on the 14th of July, 1874, to recover a like tax on the gross receipts of the defendant for the year 1873. The Act of 1872, ch. 234, was repealed, and re-enacted with amendments by the Act of 1874, ch. 408. A further statement of the cases is contained in the opinion of this Court. They were submitted to the Court below for determination, without the aid of a jury.

*Exception.*—The plaintiff prayed the Court to rule and decide as matter of law, as follows :

1st. That the Acts of 1872, ch. 234, and 1874, ch. 408, under which these actions were instituted, do not, nor do either of them, impair the obligation of any contract within the meaning of the 10th section of Article I, of the Constitution of the United States. And that for anything in the Constitution of the United States contained, the plaintiff is, under the admitted facts of these causes, entitled to recover the amount of taxes claimed in each of said suits.

2nd That for anything in the Bill of Rights or Constitution of the State of Maryland, on the admitted facts in these suits, the plaintiff is entitled to recover, as to the taxes claimed in each of said suits.

3rd. That the exemption of the shares of the capital stock contained in the charter of the Baltimore and Sus-

quehanna Railroad Company, did not exempt the property of said corporation from taxation, and that on the evidence, the plaintiff is entitled to recover in both suits.

4th. That the exemption in the charter of the Baltimore and Susquehanna Railroad Company, did not exempt the franchise of that corporation from taxation by the State, and that on the evidence, the plaintiff is entitled to recover in both suits.

5th. That the exemption of the shares of the capital stock contained in the charter of the Baltimore and Susquehanna Railroad Company, did not exempt the franchise or business of that corporation from State taxation, and that the plaintiff is entitled to recover in both suits, on the evidence.

6th. That the exemption of the shares of the capital stock of the Baltimore and Susquehanna Railroad Company from taxation, contained in the charter, is in violation of the 13th Article of the Bill of Rights of Maryland, in force at the date of the passage of the Act of Assembly of Maryland, granting said charter, and that notwithstanding said clause in said charter, on the evidence, the plaintiff is entitled to recover.

7th. That the Northern Central Railway Company is not by its charter, entitled to any exemption from taxation, by reason of anything contained in the charter of the Baltimore and Susquehanna Railroad Company, and that on the evidence, the plaintiff is entitled to recover, in both suits.

8th. That the Northern Central Railway Company is not exempt from taxation, by reason of anything in its charter contained, to a greater amount of shares of capital stock authorized to be issued by the charter of the Baltimore and Susquehanna Railroad Company, to wit: $2,000,000; and that on the evidence, the plaintiff is entitled to recover in both suits.

9th. That the tax imposed by the State in the Acts of Assembly of 1872 and 1874, on the gross receipts of said defendant, is a tax on the corporation, measured by its gross receipts, and that on the evidence, the plaintiff is entitled to recover in both suits.

10th. That the tax sought to be enforced, is laid by reason of that taxable interest in excess of the $2,000,000 of capital stock authorized to be issued, by the charter of the Baltimore and Susquehanna Railroad Company not exempt by the charter of the said Baltimore and Susquehanna Railroad Company, and that on the evidence, the plaintiff is entitled to recover in both suits.

11th. That the tax imposed by the Act of 1872, ch. 234, and of 1874, ch. 408, upon the gross receipts of Railroad Companies, incorporated by and doing business in this State, is an excise tax, upon the business of the corporation, and that on the evidence in the cause the plaintiff is entitled to recover in both suits, notwithstanding anything in the Constitntion of the United States, or the Constitution and Bill of Rights of Maryland, or the Acts of the General Assembly of Maryland contained.

12th. That the tax imposed by the Act of 1872, ch. 234, and of 1874, ch. 408, upon the gross receipts of Railroad Companies, incorporated by and doing business in this State, is a license tax for the privilege of transacting business under their charters, and that on the evidence the plaintiff is entitled to recover in both suits, notwithstanding anything in the Constitution of the United States, or the Constitution and Bill of Rights of Maryland, or the Acts of the General Assembly of Maryland contained.

The defendant prayed the Court to rule and decide as matter of law, as follows:

1st. That the defendant is not chargeable with any tax on its gross receipts under the Act of 1872, ch. 234, nor under the Act of 1874, ch. 408, as under the charter of said defendant contained in the Acts of 1854, ch. 250, and

1827, ch. 72, said defendant is exempted from said tax, and the imposition of said tax on the defendant by said State of Maryland, is a violation and impairment of the contract made by the said State with the defendant in the charter of said defendant, and therefore upon the facts as agreed on in this case, the verdict and judgment of the Court must be for the defendant.

2nd. That the attempted imposition of the tax on gross receipts of Railroad Companies by the Act of 1872, ch. 234, and the Act of 1874, ch. 408, is in violation of the 15th Article of the Bill of Rights of the Constitution of the State of Maryland, and is therefore illegal, and under the facts agreed on in this case, the verdict and judgment of the Court must be for the defendant.

The Court refused to rule as prayed by the plaintiff, but ruled and decided as asked by the defendant. The plaintiff excepted.

The Court (DOBBIN, J.) rendered a verdict in each case for the defendant; and judgment was entered accordingly. The plaintiff appealed.

The cause was argued before BARTOL, C. J., BOWIE, STEWART, BRENT, MILLER, ALVEY and ROBINSON, J.

*John H. Handy*, for the appellant.

The 15th Article of the Bill of Rights prohibits all exemptions. That Article is mandatory, and when it provides that "every person in the State, or person holding property therein, ought to contribute his proportion of public taxes for the support of the Government, according to his actual worth in real or personal property," it does not mean that *some* persons ought to do so and others ought not. Nor does it mean that in estimating his actual worth in real or personal property, any part of either his real or personal property should be deducted. The Court has held several times that this section was mandatory, in

so far as to require that taxes should be equal.   *State vs. Cumb. and Penna. R. R. Co.* 40 *Md.*, 22.

How can that principle be maintained if one person may be taxed according to his actual worth in real or personal property, whilst another is taxed according to only a portion of what he owns?

The Legislature had no power under any of our Constitutions to exempt any person whatever from taxation, or to render his taxes greater or less by reason of the character of the property he owns.   Every person owning property must be taxed.   The tax must be according to his actual worth in real or personal property; and in ascertaining that worth, no part of his property that is of value can be directed by the Legislature to be omitted.

If then the Legislature had no constitutional power to exempt any *person* from taxation, it could not lawfully *contract* to exempt the *shareholders* of the stock of the Baltimore and Susquehanna R. R. Co.   The attempt to do so would be void, and the Act of 1872, ch. 234, would therefore impair no contract between the State and the Railroad Company.   See *Maxwell, et al., Assessors vs. The State, ex rel. Baldwin,* 294.

If it be a contract, what is the extent of it?   The exemption if valid, could cover nothing except what it plainly professed to embrace, viz., "the shares of the capital stock of the said company," which are declared to be "personal estate."   It cannot be extended by implication, unless that implication is *necessary to its own existence.*   The exemption must be intended to relieve from taxation, the person who would be liable for the tax, the owner of the shares of stock.   It is he who would otherwise owe the tax, and who might be compelled to pay it by *action of assumpsit* and execution on his property generally.

In the absence then of the exemption, who would be liable to pay the tax on each share of stock as owner?   Not the corporation; for it does not, and strictly speaking, can-

not own its own stock. It would be the individual *share-holder*. It is therefore, the shareholder from whose "actual worth in real or personal property," the value of his shares of stock is to be deducted in measuring him for taxation. This is no new doctrine. It was asserted by this Court in *Howell vs. The State*, 3 *Gill*, 29.

In 1865, the New York Legislature passed an Act enabling State Banks to become National Banks, and by its tenth section provided that "all the shares in any of the banking associations organized under the Act of Congress, held by any person or body corporate, shall be included in the valuation of the personal property of such person or body corporate or corporation in the assessment of taxes," &c. The assessors in the City of Utica, assessed the shares of the capital stock of the Second National Bank of Utica, owned by one Van Allen and others, and demanded taxes in respect thereof. They refused to pay them and suits were instituted for their recovery. A part of the capital of the Bank was invested in Five-twenty bonds at the time of the assessment. Among the positions assumed by the defendants, was the very one insisted on now by the defendant in this cause, viz., that the shares of the capital stock of the corporation was only the representative of the property of the corporation, and that to tax a share of stock was in effect to tax that which it represented, and so indirectly to tax the bonds of the United States, which were exempt. The Court of Appeals held that the Act did not impose a tax on the property of the Banks, and was valid. *City of Utica vs. Churchill, et al.; Van Allen vs. Nolan, et al.*, 33 *N. Y.* 161. Upon appeal by Van Allen to the Supreme Court of the United States, that Court held that the tax on the shares of the capital stock of the bank, was not a tax on its capital. *Van Allen vs. The Assessors*, 3 *Wall.*, 583, 584.

This being so, it follows that a tax on the capital of the bank would not be a tax on the shares of the capital stock.

Or, stated in another formula : If an exemption of the capital of a corporation from taxation, does not exempt the shares of the capital stock,—*because the ownership of the two species of poperty* is not identical, then *e converso,* for the same reason, an exemption of the shares of the capital stock, cannot exempt the capital of the corporation.

It is obvious therefore that under this decision, the exemption in the charter of the Baltimore and Susquehanna R. R. Co. could extend to no other interest than that said by the Supreme Court to be embraced by similar language in the Act of Congress. It is totally immaterial whether the language be used to tax, or exempt. In either case it is to be strictly construed. The Supreme Court of the United States have repeatedly since affirmed their decision in Van Allen's case. *Bradley vs. The People,* 4 *Wall.,* 459, 461 ; *Provident Institute vs. Massachusetts,* 6 *Wall.,* 630; *National Bank vs. Commonwealth,* 9 *Wall.,* 359.

Nothing then could be clearer than that the Supreme Court holds that a tax laid upon the shares of the capital stock of the Balto. and Sus. R. R. Co. would not be a tax on the property of the company. And that an exemption of the one does not exempt the other. If this be law, the exemption in the charter of the B. & S. R. R. Co. could not extend to the property owned by that corporation.

If the exemption were valid and extended to the property of the Baltimore and Susquehanna R. R. Co., and was incorporated in the charter of the defendant, yet it did not cover any larger interest than that owned by the portion of the road forming the Baltimore and Susquehanna R. R. Co.

The language of the charter is, "that the company shall possess all the *corporate* powers and privileges * * * which are expressed in the charter heretofore granted to the said Baltimore and Susquehanna R. R. Co." What was granted to that company? It is said the shares of the capital stock, are equivalent to the entire capital of the

company. But they were limited to $2,000,000. It was that amount then which was exempted. Or, if it is said the shares might have been worth more or less than par, it was the actual value of such 20,000 shares. But the new company has $8,000,000 of stock, besides all that authorized to be created by making the Sunbury construction bonds, &c., convertible into stock. The exemption would extend then to only that amount of its property, in the proportion that $2,000,000 of the stock has to the whole amount issued. If that was only $8,000,000, then in no case could more than one-fourth of the capital of the entire corporation be exempt. *Phil., Wilm. & Balt. R. R. Co. vs. The State,* 10 *Howard,* 377; *Delaware Railroad Tax,* 18 *Wall.,* 225, 228.

The tax imposed by the Act of 1872, does not violate the 15th Art. of the Bill of Rights of Maryland. The tax is not a tax on the property *qua property* of the corporation. It is a tax required to be paid by the corporation itself, for the exercise of its business, and it is entirely immaterial whether it be called a license, an excise, or a tax on gross receipts. The intent of the Act is manifest; it is to compel those corporations to pay for the privilege of *using their* property. *State Tax on Railway Gross Receipts,* 15 *Wall.,* 293 *to* 296; *Delaware R. R. Tax,* 18 *Wall.,* 231, 232.

It is precisely in the nature of that tax which is imposed upon merchants under the license sytem. They are assessed on their property as other property owners. They have the natural right to use that property as they choose in business. The law restricts that right, and in addition to the tax imposed by reason of ownership, and which, under the clause in the Bill of Rights, must be equal among all, imposes another tax, that for using that identical property in a given way.

*Attorney General Gwinn,* for the appellant.

Under Article 3, section 47, of the Constitution of 1850, the Act of 1854, ch. 250, incorporating the appellee, was

subject to alteration by the Legislature, although the Legislature reserved in the Act itself no such power. Under the constitutional provision in question, the Legislature could not create any corporation by a special Act except on the condition that the special Act so passed was subject to alteration from time to time, or to repeal, by the Legislature. Whether the Legislature reserved this right in the special Act of incorporation, or not, could make no difference. The Constitution of 1850 itself, as the organic and controlling law, reserved to the Legislature the power to alter and amend such charter, as fully as if the reservation of such power had been made in the charter itself. *Miller vs. State,* 15 *Wallace,* 478, 497 ; *Tomlinson vs. Jessop,* 15 *Wallace,* 457.

To hold otherwise, would be to decide that the Legislature, by omitting to reserve this power of repeal, or amendment, in a special Act of incorporation granted under the Constitution of 1850, could confer powers which no subsequent Legislature could modify, and could thus exercise a right forbidden by the Constitution itself.

Article 3, section 51, of the Constitution of 1864, left the Legislature in possession of full power to amend the Act of 1854, ch. 250 ; and Article 3, section 48, of the Constitution of 1867, when it provided that " all charters heretofore granted and created, subject to repeal or modification, may be altered from time to time, or be repealed," asserted in the strongest and most express terms, the power of the Legislature to amend the Act of 1854, ch. 250.

If this Court could hold otherwise it must determine one of two things. It must either decide that a Legislature, since 1850, could, notwithstanding the constitutional provision, grant an unalterable and irrepealable charter by the simple contrivance of omitting to insert in the body of the Act a clause reserving a right to alter or repeal it ; or else it must decide that a charter of incorporation, which did not contain a clause reserving a right to alter, or repeal

it, was void because in excess of the constitutional authority of the Legislature.

It is believed that no Act was passed by the General Assembly of Maryland which operated as a repeal, or modification of the exemption of the capital stock of the appellee from taxation, until the passage of the Act of 1866, ch. 157, known as the General Assessment Law of that year. The 1st section of that Act contained the following provision : "All property, real, personal and mixed, of all kinds and descriptions whatever, in this State, shall be liable to valuation and assessment, and shall be chargeable with taxes according to the provision of this Act." The 33rd section of the same Act provided as follows: "All laws exempting property from valuation shall be and the same are hereby repealed "

It cannot be doubted that these sections of the Act of 1866, ch. 157, operated as a repeal of that exemption of the shares of the capital stock of the appellee from taxation, which had been originally granted to the Baltimore and Susquehanna Railroad Company by the Act of 1827, ch. 72, sec. 20, and which had been engrafted upon the stock of the appellee by the Act of 1854, ch. 250.

The language of these sections cannot be harmonized with any construction which would grant continued immunity to the stock of the appellee after February 5th, 1866, the day on which the Act of 1866, ch. 157, went into force. The intention of the Legislature in enacting sections 1 and 33 of the Act of 1866, ch. 157, is perfectly plain. Keeping in view these two propositions, it would seem to be clear that the sections in question, repealed the exemption from taxation, which the stockholders of the appellee had enjoyed from 1854, the date of the charter of their company, until 1866. The very point was decided in the case of the *County Commissioners of Washington County vs. Franklin Railroad Company*, 34 *Md.*, 161, 162 *and* 163.

The cases of *Miller vs. State*, 15 *Wallace*, 478, 497, and *Tomlinson vs. Jessup*, 15 *Wallace*, 457, decided two years later than the case of the *Franklin Railroad Company*, and the case of *Trask vs. Maguire*, 18 *Wallace*, 405, 406, show conclusively that the judgment in the case of the *Franklin Railroad Company*, although placed upon sufficient grounds, in fact also rests upon the broader ground that a charter, which under the Constitution of a State, is subject to amendment, may be altered by a general law affecting all corporations of its class, although the charter itself does not set forth the fact that it is thus subject to amendment.

Two deductions applicable to this case, may be made from the cases just cited.

*First.* It clearly appears that the appellee derived its corporate name and existence from the Act of 1854, ch. 250, and that the special powers and privileges with which it was invested must be considered as originally conferred by that Act. *Trask vs. Maguire*, 18 *Wallace*, 405, 406.

*Second.* That where a special charter of incorporation is subject to amendment or repeal, that power may be exercised by a general law, broad enough in its terms to reach the special object to which the amending power has been directed, without the necessity of amending such charter by a special law applicable to it alone.

Sections 1 and 33 of the Act of 1866, ch. 157, indicated the establishment of a new policy in this State, in every case in which such change of purpose could become legally operative. The enactment, therefore, of these provisions was as much a repeal of all inconsistent laws, as if such laws had been repealed by express words. *Davis vs. State*, 7 *Md.*, 159.

The manifestation of legislative intent in sections 1 and 33 of the Act of 1866, ch. 157, to subject the stock of railroad companies to taxation, in itself equivalent to an express direction, was, if possible, more conclusively mani-

fested by the Act of 1870, ch. 362. This Act in terms repealed every provision contained in any law passed by the Legislature of this State, exempting the stock or property of any railroad company from taxation, and provided that such stock and property should be subject to State, county and municipal taxation in the same manner, as the stock and property of other corporations were liable to taxation under the laws of this State.

This later law was special and declaratory only, it is believed, because such stock, if subject to taxation, had been brought within its reach by the Act of 1866, ch. 157, sections 1 and 33    But whether the Act of 1870, ch. 362, be declaratory only, or be in itself operative, it would seem to be quite certain that the effect of the whole legislation was to bring within the reach of the taxing power of the State the stock of every railroad company, incorporated since 1850, which had been previously exempt from taxation.

It cannot be successfully contended in this case, that the construction of the charter of the appellee, and of the Acts of 1866, ch. 157, and 1870, ch. 362, which has been insisted upon in this argument, involves any violation of the contract made by the State with the appellee, and that it is therefore in contravention of the Constitution of the United States.

Whenever privileges are granted to a corporation, and the grant comes under revision in the Courts, such privileges are to be strictly construed against the corporation, and in favor of the public, and nothing shall be held to pass, but what is granted in clear and explicit terms. *Holyoke Company vs. Lyman,* 15 *Wallace,* 512.

The power reserved to the State by the Constitutions of 1850, 1864 and 1867, authorized the Legislature to make any change in the contract as it originally existed. The original corporators or subsequent stockholders took their interests with knowledge, that the Legislature had the right to repeal the exemption, which the stock of the

appellee enjoyed under the Act of 1854, ch. 250, and of the possibility of its exercise, at any time in the discretion of the Legislature.

The power which the State has exercised in this case, cannot be regarded as an Act within the prohibition of the Constitution of the United States, that no State shall pass any law impairing the obligation of contracts. *Miller vs. State*, 15 *Wallace*, 488 ; *Pennsylvania College Cases*, 13 *Wallace*, 212, 213.

The corporate property of the appellee is subject to taxation under the laws of this State, even if the Court shall be of opinion, that the shares of the capital stock of the appellee is exempt from taxation under the laws of this State.

Under the Act of 1827, ch. 72, sec. 2, provision was made for the capital stock of the Baltimore and Susquehanna Railroad Company, to a certain amount, which was divided into certain shares, and the subscribers to this stock were created a corporation. By the 20th section of the same Act, the road or roads of the company, with all its works, improvements and profits, and all the machinery used for transportation on said road or roads, were vested in the said company.

Under the Act of 1854, ch. 250, all this property, with property of a like character, belonging to the other companies, which were consolidated and incorporated by that Act, was vested in the appellee ; and it was authorized to establish its capital stock at an amount not exceeding eight millions of dollars. The corporation thus created, became and remains the legal owner of all the roads, works, improvements, machinery and profits thus vested in it. *Watson vs. Spratley*, 10 *Exch. Rep.*, (*Hurlston & Gordon*,) 236 ; *Van Allen vs. Assessors*, 3 *Wallace*, 584 ; *Delaware Railroad Tax*, 18 *Wallace*, 229, 230. The *stockholders* in the corporation have no interest in, or separate right to any part of this property. They are neither joint tenants, nor

tenants in common of any part of such property. *Angel & Ames on Corporations*, (*8th Ed.*,) *sec.* 557 ; *Queen vs. Arnaud*, 9 *Ad. & Ell.*, 817, (58 *E. C. L. Rep.*, 816.)

While the appellee continues in existence, however, its stockholders have no other interest, or property in it, except a right to participate in the net profits earned by it, in proportion to their respective shares. *Van Allen vs. Assessors*, 3 *Wallace*, 584 ; *Delaware Railroad Tax*, 18 *Wallace*, 229, 230 ; *Bligh vs. Brent*, 2 *Y. & C. Exch.*, 268.

This is an interest and ownership entirely distinct from the interest and ownership represented by the corporation, and is held by the stockholder in the same manner as any other property belonging to him. *Van Allen vs. Assessors*, 3 *Wallace*, 584.

The gross profits of the appellee were vested in the corporation, (Act of 1827, ch. 72, sec. 20 ; Act of 1854, ch. 250 ;) and the appellee was only bound, at certain periods, to divide among the stockholders, in proportion to their respective shares, such portion as it deemed proper of the net revenue of the company, ascertained by deducting from its gross receipts, the necessary current and probable contingent expenses, (Act of 1827, ch. 72, sec. 21.) The different ownerships of the corporation and of its stockholders, already defined upon general principles, are precisely indicated in the Acts governing the appellee.

It may probably be taken for granted, that when stock is subscribed for in a corporation, having a capital stock divided into shares, the legal effect of the transaction is this : The money paid by the subscribers becomes the capital of the corporation ; and such money, and all property in which it is invested, and the profits of all such property, belong to the *corporation*. The stockholders obtain, in consideration of their payment for the stock for which they have respectively subscribed, only a right to proportional shares in the net profits of the corporation,

when ascertained, at the times provided for by the charter
or by-laws of the corporation. When a dividend is de-
clared, the respective shares of the stockholders in such
dividend become for the first time their property. Until
a dividend is declared, the profits of the corporation, as
well as the property of the corporation, belong to the cor-
poration only.

Why then, upon principle, should the fact that the
right of any person to share in the net profits of a cor-
poration is exempt from taxation, operate as an exemption
of the property and profits of the corporation itself from
taxation? If such property and profits of the corporation
have not been expressly exempted by law from taxation,
and are therefore liable to it, the enforcement of such
claim is no breach of any contract with the stockholder.
For if, as such stockholder, he has no right to anything
except a share in the net profits of the corporation, remain-
ing after the payment of all expenses of management, and
of all charges upon the corporation, and any taxes be such
charge, there is no breach of any contract. The right of
the stockholder to his share in the true net profits of the
corporation is preserved unimpaired.

There would be no hardship in deciding that the pro-
perty of the appellee was taxable. Its stockholders have,
as has been shown, no other right under their contract
with the corporation, or under the charter of the corpora-
tion, except a right to their respective shares in the net
profits of such corporation. The property and gross pro-
fits of the corporation belong to it. If these are liable to
taxation, then the original subscribers to, and all holders
of, the stock of such corporation, must be presumed to
have taken their interests with knowledge that the Legis-
lature had power to tax the whole property of the corpora-
tion, and of the possibility of its exercise at any time in
the discretion of the Legislature. *Tomlinson vs. Jessup*,
15 *Wallace*, 458. They must be presumed to have been

content that the road, works, improvements, and even the gross profits of the corporation, should be subject to taxation, in the ordinary manner, provided their respective rights of property in the net profits of the corporation, remaining after all these charges were paid, were exempt from taxation.

To treat the shares of stock in a corporation and its property as identical, is to violate that uniform rule of taxation which this Court insisted on in *State vs. Cumb. & Penn. R. R. Co.*, 40 *Md.*, 50. Under the laws of this State, no abatement is allowed from the value of real estate, held by any person, because he is in debt, and has no other property. Why should the Act of 1827, ch. 72, sec. 20, engrafted on the Act of 1854, ch. 250, be construed as creating a different rule for a corporation?

If the stock only of a corporation is to be assessed, and must be assessed at its market value, then, as that market value represents its worth, after taking into account every debt and obligation owing by the corporation, is it not clear that in taxing the stock only of a corporation, there is practically allowed a deduction from the value of the property of the corporation to the whole amount of the debts and liabilities of such corporation? Under such a construction of the revenue laws of this State, it is plain that the property of the corporation, if such property is represented by stock, does not in many cases pay its just share of the public burdens.

*Bernard Carter*, for the appellee.

I. All the exemptions from taxation contained in the charter of the Baltimore and Susquehanna R. R. Co., (Act of 1827, ch. 72, sec. 20,) were transferred by the Act of 1854, ch. 250, to the appellee, the portion of which lying within the State of Maryland, embracing and being identical with the said Baltimore and Susquehanna Railroad Company.

The exempting clause is the very concluding clause of the 20th section, and in these words: "And the said road or roads, with all their works, improvements and profits, and all the machinery of transportation used on said roads, are hereby vested in the said company incorporated by this Act, and their successors forever; and the shares of the capital stock of the said company shall be deemed and considered personal estate, and shall be exempt from the impositions of any tax or burthen, by the States assenting to this law."

This provision is in *totidem verbis* with that of the concluding clause of the 18th section of the charter of the Baltimore and Ohio Railroad. (See *Act of* 1826, *ch.* 123, *sec.* 18.)

Whatever privilege or immunity was conferred on the ·Baltimore and Susquehanna Railroad by the above quoted clause in the charter, which exempts "the shares of its capital stock from the imposition of any tax or burthen by the State of Maryland," was, by the Act of 1854, ch. 250, kept alive, and continued to the Northern Central Railway Company.

The stockholders of the Balt. & Sus. R. R. Co., were by said Act of 1854, ch. 250, authorized to unite and consolidate said company or corporation, with three other corporations chartered by the State of Pennsylvania, so as to form one company, or corporation to be called the Northern Central Railway Co., "*on such terms and conditions, and conformably to such regulations and agreements as said several companies shall respectively determine and adopt,*" subject, however, to certain provisions in said Act specified. Full authority was thus given to the several companies, to fix and determine in every respect, *at their own pleasure,* the terms and conditions of their union; to make unto themselves, in other words, the law of their united being or existence, to determine what rights, privileges and immunities, the company to be formed by their union should have.

The extent of such rights, privileges and immunities, were not fixed by the Act of 1854, ch. 250, but the permission was thereby given to said companies to agree on, and·ascertain these for themselves ; the only limitation placed on the exercise of this power, is that the exercise of it is to be within certain bounds, that is to say, it was to be subordinate to certain general provisions.　Unless, therefore, the terms of union as agreed on by the companies themselves, violated these general provisions, and went beyond the bounds set for them, all their terms as agreed on among themselves, were made valid by the very terms of the Act of 1854, ch. 250.

In accordance with the authority thus given, the said several companies did agree on articles of union, so as to form one company out of said four companies.　In the first of the articles of union, after providing for the union of the four companies so as to form one company, it is added :　"And all the estate, real, personal and mixed, and all the *rights, privileges and immunities* belonging to each of said corporations, shall become, and be vested in the said body corporate."　Now, unless this article is at war with some of the general provisions set forth in the 1st section of the Act of 1854, ch. 250, it is as valid and operative as if embodied in the Act itself.　So far from being at war with said general provisions, it is in perfect accord with them.

Those of said general provisions, bearing on this point, are as follows :　"Second. That all laws *heretofore* made in reference to the Balto. & Sus. R. R. Co., and not repealed or modified by the Legislature of Maryland, and all ordinances of the Mayor and City Council of Baltimore relating to said company, heretofore made and not repealed, shall be binding and operative upon the said consolidated company, so far as its property or its operations may be within the State of Maryland, or the City of Baltimore, respectively, and so far as the same may be applicable to,

and consistent with the new organization of said consolidated company."

And in the 5th general provision, is the following: "The said company shall make and use a common seal, and possess all the corporate *powers and privileges*, and be subject to all the duties and obligations not inconsistent with this Act, and with its general intent, which are expressed in the charter heretofore granted to the Baltimore & Sus. R. R. Co., and its supplements."

The language of the two clauses just quoted from the Act itself, clearly show that the exemption from taxation, granted to the Baltimore & Sus. Railroad Co., by the clause declaring "the shares of its capital stock to be exempt from the imposition of any tax or burthen," is to be enjoyed by the Northern Central Railway Co.

That upon the formation of the Northern Central Railway Co. by the union of the four companies, the exemption from taxation secured to the Baltimore & Sus. Railroad Co., in its charter, was extended to the Northern Central R. R. Co., to the extent of that part of its road which was formerly the Balto. & Sus. R. R. Co., (which is the whole of the N. C. R. R. in Maryland,) by the terms of the Act of 1854, ch. 250, is expressly decided by the Supreme Court of the United States int he case of the *Phil., Wilm. & Balt. R. R. Co. vs The State*, 10 *How.*, 376, 393.

The Act of 1854, ch. 250, is in the main modeled on, and a reproduction of the Act of 1837, ch. 30, under which the present Phil., Wilm. & Balt. R. R. was formed by the union of three separate companies; and it was the rights growing out of such consolidation that were under consideration in 10 *How.*, 376. See the more recent cases of *Tomlinson vs. Branch*, 15 *Wallace*, 460, 465; *Del. Tax Cases*, 18 *Wallace*, 227, 228.

II. The exemption from taxation granted to the Balt. & Susq. R. R. Co. by the Act of 1827, ch. 72, sec. 20, and continued and extended to the appellee by the Act of 1854,

ch. 250, is not capable of repeal or abrogation by the State of Maryland; and said exemption has not been in fact repealed or abrogated by any laws of said State, passed since said Act of 1854, ch. 250.

The proposition which may be said to lie at the root of all others on this question, and indeed, practically to embrace and include them all, is this, viz., that inasmuch as the Constitution of Maryland, of 1850, by the 47th section of Art. 3, provided that all laws and special Acts (for formation of corporations) passed pursuant to that section, may be altered from time to time, or repealed, and inasmuch as the Act of 1854, ch. 250, was passed while that Constitution was in force, therefore the Act of 1854, ch. 250, and all the exemptions from taxation thereby secured to the appellee, were liable to alteration or repeal,—and that therefore the Acts of 1866, ch. 157, and the Act of 1870, ch. 362, did repeal all exemptions of the appellee from taxation secured to it by the Act of 1854, ch. 250.

In reply to this proposition: Inasmuch as the Act of 1854, ch. 250, (which contains no clause authorizing a repeal of any of its provisions,) if subject to repeal at all, was so because of the 47th section of Art. 3 of the Constitution of Maryland, which provided that all laws, general or special, creating corporations, passed pursuant to said 3rd section, may be altered or repealed, it follows that the power to repeal any law thereafter passed, creating corporations, and therefore the power to repeal the Act of 1854, ch. 250, is derived from, and is altogether dependent on the Constitution of 1850. This Constitution is the *sole source* of the power of such repeal. Because *but* for this provision in the Constitution of the State, operative when the Act of 1854 was passed, the law is too well established now to be shaken, that the Act of 1854, ch. 250, containing as it does, no clause authorizing its repeal or modification, would constitute a contract between the State and the Company, *inviolable* and *unrepealable*. *Wil. R. R. vs. Reid,*

13 *Wallace*, 264 ; *Del. Tax Cases*, 15 *Wallace*, 206 ; *M. & C. C. vs. B. & O. R. R.*, 6 *Gill*, 288.

The Act of 1854, ch. 250, must stand therefore unrepealed, unless it is repealed by some Act passed in pursuance of the Constitution of 1850. If, when it was passed, there had been no provision in the then existing Constitution of Maryland, declaring that such Acts might be repealed or modified, such Act of 1854, ch. 250, would have thereafter been forever unrepealable.

The moment this Constitution ceased to exist, then and at that moment the power to repeal or modify the Act of 1854, ch. 250, ceased.

The Constitution of 1850 was succeeded and *supplanted* by the Constitution of 1864. This Constitution of 1864 contains a similar provision in the 51st section of Article 3, as is contained in the 47th section of Article 3 of the Constitution of 1850.

The Act of 1866, ch. 157, is the earliest law relied on by the Attorney General as a repeal of the Act of 1854, ch· 250. This Act was of course passed during the existence of the Constitution of 1864.

This law, in its 33rd section, declares that "All laws exempting property from valuation shall be and the same are hereby repealed." It is this section (aided by the 1st section) which is principally relied on by the Attorney General, as operating as a repeal of the Act of 1854, ch. 250, so far as the latter exempts the property of the appellee from taxation. Of course, since the case of *Com'rs of Wash. Co. vs. Franklin R. R.*, 34 *Md.*, 161, the appellee will not contend in this Court that the said Act of 1866, ch. 157, does not operate to repeal all exemptions from taxation which it was within the power of the Legislature at the time of the passage of the said Act to repeal.

But upon what prior Act of Assembly conferring corporate rights, franchises and privileges can the Act of 1866, ch. 157, operate? This is the question for solution here.

The Attorney General contends that it operates on the Act of 1854, ch. 250. How can it? No general law is pretended then to have been in existence bearing on the subject.

The Constitution of 1850, (being that in existence when the law of 1854, ch. 250 was passed,) is that alone therefore, from whose provisions the power to repeal the Act of 1854 can be alone derived.

Now, if it be not true, that unless this power to repeal is *exercised* during the *existence* of the Constitution of 1850, it is *gone forever*, and that, therefore, the Act of 1866, ch. 157, cannot be a valid exercise of the power, let us suppose that the Constitution of 1864 had contained no such provision, as is contained in the 51st section of its 3rd Article; that is to say, suppose there was no provision in this Constitution of 1864, providing that all charters of corporations, passed under its provisions, should be repealable—Would it be contended, that in this state of the case the Act of 1866, would have operated to repeal the Act of 1854, ch. 250, or any other corporation charter granting exemptions from taxation? Manifestly it could not be successfully contended in this state of case, that any law granting corporate exemption from taxation, passed subsequent to the adoption of the Constitution of 1864, would be repealed as to said exemption by said Act of 1866, ch. 157.

This, under the decisions of the Supreme Court of the United States, previously referred to, and among them those relied on by Attorney General, would be clearly impossible. If this be true, then how could the Act of 1866, ch. 157, operate to repeal any chartered exemption granted prior to the Constitution of 1864, except in the case where the right so to repeal was a part of the charter itself?

Clearly at the time of the passage of the Act of 1866, no Constitution was in force in Maryland, but the Constitution of 1864. The Constitution of Maryland of 1850,

was then as dead as if it had never existed,   Whatever powers therefore, on this subject, the Legislature had in 1866, it derived not from the Constitution of 1850, but from the Constitution of 1864.   If, therefore, the latter had contained no provision similar to the one in question in the Constitution of 1850, no charter granted under it would be repealable, unless the power to repeal was contained on its face.

This clearly shows, that whatever power the Legislature had to repeal any charter granted under the Constitution of 1864, was derived from its express provisions, and not from the pre-existent dead provisions of the Constitution of 1850.

What corporation charters then does the Constitution of 1864 give the Legislature the right to repeal?   Not charters granted under and during the existence of the Constitution of 1850—but only charters granted under the Constitution of 1864.   (*See* 51*st sec. of Art.* 3.)

Well, if this be so, then it is not charters *theretofore*, that is under some *prior* Constitution, which are by the Constitution of 1864, declared to be repealed.   Then, as there can be only one Constitution in force in Maryland at a time, it follows, that as the Constitution of 1864 limits the power of repeal to such charters as should be passed under ITS provisions, no power to repeal any charters granted under *previous* Constitutions is given by the Constitution of 1864.   Therefore, as the moment the Constitution of 1864 came into existence, the Constitution of 1850 ceased to exist, and with it, all its provisions, and among them all provisions for the repeal of charters granted under *it*—it follows of necessity, that no charter granted during the existence of the Constitution of 1850, which did not *on its face* contain an authority for its repeal, and which was not repealed during the existence of the Constitution of 1850, is ever *thereafter repealable.* The Act of 1854, ch. 250, is not repealable on its face.

It was (*if repealable at all,*) repealable because the Constitution of 1850, made charters granted under its provisions repealable.

When the law which *alone* made the provisions of the Act of 1854, ch. 250, repealable, was itself repealed by the people of Maryland, as it was when they adopted the Constitution of 1864, and *before* the Legislature, acting under its powers, *had repealed* said Act of 1854, ch. 250, then all power to repeal the Act of 1854, ch. 250, was forever gone. The Act of 1866, ch. 157, can have no application therefore to the Act of 1854, ch. 250.

The Act of 1870, ch. 362, was passed under the Constitution of 1867. Manifestly if the right to repeal charters granted under the Constitution of 1850, was limited to, and expired with that Constitution, and did not exist thereafter, then the Act of 1854, ch. 250, is to be held as having been passed, subject only to such repeal; and, therefore, any law purporting to repeal said Act of 1854, ch. 250, passed subsequently, is a violation of the contract made by the passage of the Act of 1854, ch. 250, and so is unconstitutional

But again—The language of the 48th section of the Constitution of 1867, Article 3, is "All charters granted or adopted, pursuant *to this section,* and all charters *heretofore* granted and created, subject to repeal or modification, may be altered, &c."

Now the words " all charters heretofore granted and created, subject to repeal or modification," if not applying only to such as contained an authority for their repeal on their face, which is the most natural interpretation of the words, can only apply to such as at that time were subject to repeal.

A State Constitution cannot any more than a State law passed subsequently to a charter, alter or repeal that charter. It was, therefore, altogether out of the power of the people of Maryland, by adopting the Constitution

of 1867, to give any different effect or operation to the Act of 1854, ch. 250, than it had when it was passed; which was at the most, but a liability to repeal under, and during the existence of the Constitution of 1850, and no longer.

But the Act of 1854, ch. 250, is not a law coming within the scope of the 47th section of Article 3 of the Constitution of 1850. Properly interpreted, the said section of the Constitution, has no application to the Act of 1854, ch. 250. Neither according to the letter, and much less to the spirit of the said 47th section does the Act of 1854, ch. 250, "*create*" The Northern Central Railway Company into a corporation. The act of creation is the act of the four already existing corporate bodies. It is by the Articles of union, that the formation of the Northern Central Railway Company results. They, and not the Legislature of Maryland, form out of themselves, who were already existing corporations, a new corporation.

The terms of their union, which terms they were expressly authorized to fix, declare that the corporation they formed was to have all the "rights, privileges and *immunities*," which the Balt. & Sus. R. R. Co. had, and which each of the other corporations had. The Act of 1854, ch. 250, therefore, is to be construed, not as "creating" a new corporation itself, but as authorizing an already existing Maryland corporation to join itself to three other corporations, and to make with them a *contract* of union, on terms to be by them agreed on. 15 *Wall.*, 459; 15 *Wall.*, 498.

III. Under the charter of the Baltimore & Susquehanna R. R. Co., (Act of 1827, ch. 72, sec. 20,) the capital stock having been exempted from the "imposition of any tax or burthen" by the State of Maryland, and this exemption having been kept alive, and transferred to the stock of the appellee, by the Act of 1854, ch. 250, the latter corporation is thereby, and because of the exemption of its capital stock from taxation, exempt from a tax on its

gross receipts ; and therefore, neither the Act of 1872, ch. 234, nor the Act of 1874, ch. 408, impose (even if such were their intention,) any valid tax on the gross receipts of the appellee.

The "shares of the capital stock" of the corporation, include and embrace all the property of every kind, whether that property be the franchise, or the real or personal property of the corporation, and, therefore, so including all of said property, the exemption of the shares of stock from taxation, of necessity includes an exemption of all that which is embraced and included in said shares. *Mayor & City Council of Baltimore vs. Balt. & Ohio R. R. Co.,* 6 *Gill,* 288, 296.

The Court in that case say, (p. 296,) "The shares of stock embrace every species of property owned by the company." If, therefore, all the property is included in, and represented by the shares of stock, as thus decided, the gross receipts of the company, which is nothing but the amount received from the user of that property, are also included ; such gross receipts are, and become the property of the company. See *Gross Receipt Cases,* 15 *Wall.,* 294, 295 ; *State vs. Hood,* 15 *Richardson L. Rep.,* 177 ; *State of Md. vs. Cum. & Pa. R. R. Co.,* 40 *Md.,* 22 ; *Wilmington R. R. vs. Reid,* 13 *Wall.,* 264 ; *Trask vs. Maguire,* 18 *Wall.,* 391 ; *Delaware R. Tax,* 15 *Wall.,* 206 ; *Mayor, &c. of Baltimore vs. Gordon,* 5 *Gill,* 236 ; *The Tax Cases,* 12 *G. & J.,* 117.

The tax attempted to be imposed on the gross receipts of the appellee by the Comptroller, by the institution of this suit is invalid, because of the exemption clause of the charter of the B. & S. R. Co., incorporated with the charter of the appellee, said "gross receipts" being embraced in and represented by the capital stock of the company.

The Acts of 1872, ch. 234, and 1874, ch. 408, are to be read therefore and interpreted, as if they applied only to such railways as were not exempted from the taxation

thereby imposed by their previous contracts with the State
of Maryland, and unless the said Acts are unconstitutional
this language can be gratified by so reading them.

The appellee is not mentioned by name in these Acts ;
and if it is exempt from their operation by reason of its
charter, the law can still be upheld by reading its lan-
guage, as being *intended* to apply only to those railroad
companies not exempt from taxation under their charters.

IV. It was within the scope of the power of the Legis-
lature, to grant the exemption given by the Act of 1827,
ch. 72, and continued by the Act of 1854, ch. 250, and,
therefore, said laws are constitutional.    13 *Wallace*, 264 ;
6 *Gill*, 288 ; 15 *Wallace*, 206 ; 16 *Howard*, 369, *and* 416.

But, independent of these decisions, inasmuch as the Act
of 1854, ch. 250, was passed, the appellee incorporated
after the decision in 6 *Gill*, 288, and 12 *G. & J.*, 117, and
5 *Gill*, 236, the said decisions will be adhered to even if
wrong, on the principle stated in 16 *Wall.*, 678.

V. The Acts of 1872, ch. 234, and 1874, ch. 408, are
in violation of the 15th Article of the Bill of Rights.    6
*Gill*, 288 ; 40 *Md.*, 22 ; *Commonwealth vs. Manufacturing
Co.*, 12 *Allen*, 300 ; *Oliver vs. Washington Mills*, 11 *Allen*,
275.

ROBINSON, J., delivered the opinion of the Court.

The Baltimore and Susquehanna Railroad Company was
chartered in 1827, for the purpose of constructing a rail-
road from the City of Baltimore to the Susquehanna river,
with a capital stock of $1,000,000, and with power to
increase the stock to $2,000,000.

By the Act of 1854, chapter 250, the stockholders of
said company were authorized to unite and consolidate
with "The York and Maryland Line Railroad Company,"
"The York and Cumberland Railroad Company" and
"The Susquehanna Railroad Company," corporations char-
tered by and lying in the State of Pennsylvania, so as to

form one corporation, to be called "The Northern Central Railway Company," on such terms and conditions, and conformably to such agreements and regulations as the said several companies might respectively determine and adopt, subject, however, to the following, among other conditions set forth in said Act:

That all laws made in reference to the Baltimore and Susquehanna Railroad Company, not repealed or modified by the Legislature of Maryland, should be binding and operative upon the said consolidated company, so far as its property or operations were within said State, and so far as said laws were applicable to, and consistent with, the new organization of the said consolidated company.

That the said consolidated company should have the power, from time to time, to establish its capital stock to an amount not exceeding eight millions of dollars.

That the said company should possess all the corporate powers and privileges, and be subject to all the duties and obligations, not inconsistent with the Act and its general intent, which were expressed in the charter granted to the Baltimore and Susquehanna Railroad Company, or in the supplements to that charter.

The Act further provided that it should go into effect whenever the several corporations had agreed to consolidate their several companies into one, and had agreed upon the terms and conditions of such consolidation, and had made a full report thereof, duly certified, to the Governor of Maryland, to be recorded in the office of the Secretary of State.

Power to unite and consolidate with the Baltimore and Susquehanna Railroad Company was also granted to the three Pennsylvania companies by the Legislature of that State.

The Act of 1854 was accepted by the stockholders of the Baltimore and Susquehanna Railroad Company, and articles of union were executed, by which all the property, rights,

privileges and immunities belonging to the said several companies, were transferred to the new company.

By the 20th section of the Act of 1827, ch. 72, which was the charter of the Baltimore and Susquehanna R. R. Company, it was· provided that the shares of the capital stock of the said company should be deemed and considered personal estate, and be exempt from the imposition of any tax or burthen.

It is claimed by the appellee, that as the Maryland Act of 1854 provides that the Northern Central Railway Company should possess the corporate powers and privileges granted to the Baltimore and Susquehanna Railroad Company by the Act of 1827, it follows that the capital stock which the Northern Central Railway Company was authorized to issue under the Act of 1854, is exempt from taxation ; and that inasmuch as these shares of stock represent all the property of the company, such property is in every form also exempt from taxation.

Conceding this to be true, and conceding also, that the Legislature had the power, under the Constitution of this State, to exempt the shares of stock and property of the appellee from the imposition of any tax or burthen, questions unnecessary to be decided in the view we take of this case, the question is whether the exemption thus claimed is beyond the power of the Legislature to repeal?

There is no provision in the Act of 1827 incorporating the Baltimore and Susquehanna Railroad Company, nor in the Constitution then in force in this State, nor was there any prior general law, reserving to the State the right to amend, alter or repeal the charter thus granted·.to the company.   The charter must therefore be regarded as an executed contract between the State and the corporators, and within the protection of the Constitution of the United States, which ordains that no State shall pass any law impairing the obligation of contracts.   *Miller vs. State,* 15 *Wallace,* 488.

So long then, as the Baltimore and Susquehanna Railroad Company existed as a corporate body, exercising the rights and privileges vested in it under its charter, the Legislature possessed no power to subject the shares of its stock to the imposition of any tax or burthen. But by the Act of 1854 the stockholders of said company were authorized to unite and consolidate with the three Pennsylvania companies, so as to form a new company, to be called the Northern Central Railway Company. This Act was accepted by the stockholders, and in pursuance of its provisions articles of union were executed. It is clear then that under the operation of this Act, and under the articles of union above referred to, the Baltimore and Susquehanna Railroad Company was by due authority of law merged in the Northern Central Railway Company. To this new company it had transferred all its rights and property—it had extinguished its capital stock—its board of directors had ceased to exist; and all its corporate powers and privileges, by the express terms of the Act of 1854, became vested in the consolidated company. The merger was complete and absolute, and the Baltimore and Susquehanna Company, as a corporation, ceased to exist. In its place, and in the place of the three Pennsylvania companies, a new corporation was created. The corporate rights and privileges formerly belonging to the Baltimore and Susquehanna Company were, it is true, vested in the new company, and the provisions of the Act of 1827, incorporating the original company, were to that extent embodied in, and re-enacted by, the Act of 1854. But the rights and privileges thus conferred, became new and special grants to the Northern Central Railway Company, dating from the period when the Act of 1854 went into operation.

Other rights and privileges were also granted to the corporation thus created—the power to make and use a common seal—to elect a board of directors—to increase its capital stock to eight millions of dollars—to issue bonds

convertible into stock, and in the language of the Act, to make such provisions and regulations as may be necessary to create and establish said consolidated company.

In no sense then, can it be said that the appellee was created by the articles of union, executed by the respective companies.

The stockholders of the Baltimore and Susquehanna Company were authorized by the Act of 1854, to consolidate with the Pennsylvania companies, and the acceptance by them of this Act, and the execution of articles of union were conditions precedent to the incorporation of. the new company, but when these conditions were complied with, the appellee as a corporation, derived its existence, and was in terms created by the operation of the Act of 1854. Now, when this Act was passed, the Constitution of 1850, was in force in this State, which ordained:

" That corporations may be formed under general laws, but shall not be created by special Act, except for municipal purposes ; and in cases where in the judgment of the Legislature, the object of the corporation cannot be attained under general laws. All laws and special Acts pursuant to this section, may be altered from time to time or repealed," &c. *Sec.* 47, *Art.* 3. The Constitutions of 1864 and 1867, subsequently adopted in this State, each contains a similar provision.

We cannot overlook the reasons which led to the adoption of these provisions in the organic law of the State. The power of the Legislature to alter or repeal a charter unconditionally granted to a private corporation, was no longer an open question ; and it had become settled law, that unless there was a reservation either in the charter, or in a general law or the State Constitution, of the right to modify or limit the nature of the contract, the Legislature possessed no power to amend or repeal such charter, against the consent, or without the default, of the corporation, judicially ascertained and declared. *Miller vs. The State,* 15 *Wallace,* 488.

The object of this provision in the Constitution of 1850, was to preserve to the State, control over its contracts with corporations, and to prevent the grant of corporate powers beyond the interference of the Legislature, should the public interests at any time require such interference. It constituted therefore a condition upon which every charter was granted and held, and qualified to that extent, the contract between the State and the corporators.

The appellee having derived its charter under the Act of 1854, when the Constitution of 1850, was in force, and the exemption from taxation claimed, being a part of such charter, the power of the Legislature to repeal or revoke the immunity thus granted, is, we think, too clear to be questioned. The fact that no such right was reserved in the Act of 1854, incorporating the appellee, can make no difference. The Constitution is the supreme and controlling law, and under its provisions, the right to alter, amend or repeal every charter granted by the Legislature to a private corporation is reserved as fully as if such reservation had been made in the charter itself. *Miller vs. The State,* 15 *Wallace,* 478; *Tomlinson vs. Jessup,* 15 *Wallace,* 457; *Fletcher vs. Peck,* 6 *Cranch,* 136; *Terrett, et al. vs. Taylor, et al.,* 9 *Cranch,* 51.

To hold otherwise, would be to decide that the Legislature by omitting such a reservation, could confer a power beyond the interference of the Legislature, and thus exercise a power forbidden by the Constitution. The charter of the appellee must therefore be construed as if such reservation had been made in express terms by the Act of 1854. And if so, the case comes directly within the principle laid down in *Washington County vs. Franklin Railroad Company,* 34 *Md.,* 160.

In accepting the Act of 1854, and in the execution of the articles of union, under the operation of which the Baltimore and Susquehanna Railroad Company, has merged and ceased to exist, the stockholders are presumed

to have known that the corporate powers and privileges granted by that Act to the Northern Central Railway Company were subject to the provisions of section 47, Article 3, of the Constitution, and that the exemption from taxation claimed under that Act was liable at any time to be repealed by the Legislature, whenever, in its judgment, the public interests required it.   Be that however as it may, it was not within the power of the Legislature under the Constitution of the State, to grant to the appellee immunity from taxation, or any other corporate privilege, beyond the power of a subsequent Legislature to repeal or revoke

This being so, the question is, whether the exemption from taxation claimed under the Act of 1854, has been repealed, and this depends upon the construction of the Acts of 1866, chap. 157, 1870, chap. 362, and 1872, chap. 234.

The Act of 1866, known as the general assessment law, provides in general terms for the taxation of all property in the State ; and repeals also, all laws exempting property from taxation.

The Act of 1870, chap. 362, provides:

"That all and every provision contained in the charter, or supplements thereto, of any railroad company incorporated by the laws of this State, or contained in any law heretofore passed by the Legislature of this State, whereby the stock or property, real or personal, of any railroad company   *   *   *   *   is exempted from taxation, be, and the same is hereby repealed."

The Act of 1872, chap. 234, provides:

"That a State tax of one-half of one per centum, be, and the same is hereby levied annually, upon the gross receipts of all railroad companies worked by steam."

And here we are met by the objection, that as there is no reservation in the charter of the appellee, of the right to amend or repeal such charter, the power if it existed,

was derived solely from the provisions of the Constitution of 1850, and, inasmuch as that instrument had been superseded by the Constitutions of 1864 and 1867, subsequently adopted in this State, the power itself no longer existed.

The plain answer to this is, that the reservation under the Constitution of 1850, qualified and became part of the charter, as fully as if it had been incorporated in the Act itself. It was the condition upon which the charter was granted, and thus became part of the contract between the State and corporators. If then the power to alter or repeal the charter of the appellee was reserved to the State, as fully as if such reservation had been set forth in express terms in the Act of incorporation, the right to exercise this power, could not in any manner be affected by the adoption of the Constitutions of 1864 and 1867.

We come then to the question as to the effect and operation of the Acts of 1866 and 1870 and 1872.

It is unnecessary to review the many cases in which Courts have considered how far, and under what circumstances, *a subsequent general Act* will be held to operate as a repeal of *a prior private Act*. As a general rule, it may be admitted, that a general Act is not to be construed to repeal a previous particular Act, unless there is some express reference to the previous Act, or unless there is a necessary inconsistency in the two Acts. Where, however, the provisions of a general Act are entirely inconsistent and irreconcilable with the provisions of a prior private Act, the former must necessarily operate as a repeal of the latter, because it is impossible for the two Acts to stand together. *Great Central Gas Consumers' Co. vs. Clarke,* 103 *E. C. L.,* 812, and 106 *E. C. L. Rep.,* 837; *Queen vs. Champneys,* 6 *Com. Pleas, L. R.,* 393; *Canal Company vs. Railroad Company,* 4 *G. & J,* 112; *Mayor of Cumberland vs. Magruder,* 34 *Md.,* 386.

In such a case, the intention of the Legislature, that the latter Act should repeal the former, appears by necessary

implication   *In re London & Eastern Banking Corporation*, 4 *Kay. & J.*, 286 ; *Thorpe vs. Adams*, 6 *Com. Pleas, L. R.*, 123.

Now it must be conceded, that the provisions of the several Acts above referred to, are repugnant to, and inconsistent with, the continuance of the exemption claimed by the appellee under the Act of 1854.

Not only does the Act of 1866, subject to taxation all property in the State, and repeal in general terms all exemptions heretofore granted, but the Act of 1870, ch. 362, provides that all and any provision contained in the charter, or supplements thereto, of any railroad company, whereby its stock or property is exempted from taxation, be, and the same is hereby repealed ; and by the 2nd section, such stock and property is subjected to taxation, for State, county and municipal purposes, in the same manner as the stock and property of other corporations.

The intention of the Legislature to subject all property in the State to taxation, and to repeal all exemptions granted to railroad companies, is thus expressed in language, plain and unambiguous, and the effect and operation of these Acts can admit of but one construction.

The provisions of these Acts are repugnant to, and inconsistent with, the exemption from taxation granted to the appellee by the Act of 1854, and as these several Acts cannot stand together, the former must be construed as a repeal of the particular Act, under which the immunity now claimed by the appellee is derived.

But, admitting the Legislature had the power under sec. 47, Article 3 of the Constitution, to repeal the exemption granted to the appellee ; and that the Acts referred to, operated as a repeal of such exemption, it is contended that the tax imposed by the Act of 1872, ch. 234, on the gross receipts of the company, is in conflict with Article 15 of the Bill of Rights which declares

" That every person in the State, or person holding property therein, ought to contribute his proportion of public

taxes for the support of the Government, according to his actual worth in real or personal property."

In the case of the *State vs. The Cumberland & Pennsylvania Railroad Company*, 40 *Md.*, 22, it was held that the restriction imposed by this Article of the Bill of Rights, was intended to prevent an arbitrary taxation of property according to kind and quality, without regard to value; and that under it, all taxation laid on property, must be uniform and equal. Giving full force to the construction thus placed upon the Bill of Rights, it is sufficient to say, there is nothing in the record before us, to show that the tax imposed by the Act of 1872, is unequal or unjust, or that it subjects in any manner the property of the appellee to taxation, not equally borne by other property in the State.

Being of opinion that the tax imposed by the Act of 1872, upon the gross receipts of the company is a valid tax, it is unnecessary to decide whether the exemption of the shares of stock, exempted also every species of property belonging to the appellee. In regard to this question, we are not to be understood as expressing any opinion.

The Court erred therefore in granting the first and second prayers of the appellee, and in refusing the first and second prayers of the appellant. The several propositions presented by the other prayers of the appellant, it becomes unnecessary for us to consider.

*Judgment reversed, and
new trial awarded.*

(Decided 2nd March, 1876.)

ALVEY, J., filed the following dissenting opinion:

As I am not able to agree to the opinion that has been filed in this case, I deem it proper to state the grounds of my dissent.

If the question here involved were now for the first time presented for determination, I should have no hesitation in declaring that it is not within the power of the Legislature so to alienate the sovereign right of taxation as to bind and conclude succeeding Legislatures, and that any contract to that effect would be void. No right, of all the sovereign rights of the State, is more essential, and, indeed, indispensable to the very existence and well being of the State, than that of taxation, and such right is a sacred trust in the hands of the Legislature, not to be abandoned or bartered away, at its discretion, under any circumstances. Especially should I so declare, in view of the 15th Article of the Bill of Rights of this State, in force since 1776, which declares that "every person in the State, or person holding property therein, ought to contribute his proportion of public taxes for the support of the Government, according to his actual worth in real or personal property." This is a mandatory rule, and should never have been disregarded. It should, as I think, have been accepted as a constitutional restriction upon the Legislature against granting exemptions or immunities from taxation in favor of some to the prejudice of the rest of the community. But, unfortunately, the long established practice, and the repeated decisions of our predecessors, have so far fixed the construction, and established the right in the Legislature, to grant exemptions from taxation, that it cannot now be approached as a question open for discussion. We must therefore take the law as we find it settled, and apply it to cases as they arise, without regard to what our opinions would be if not controlled by authority.

The record before us presents this case: The Baltimore and Susquehanna Railroad Company was chartered by the State in 1827, to construct a road from the City of Baltimore to a point on the Susquehanna river. The charter was accepted, the company organized, and the road constructed, and which was operated under the charter until

1854. The capital stock of the company was $1,000,000, divided into 20,000 shares of $50 each, with power to increase the capital stock to $2,000,000. In the Act of incorporation is the following provision: "The said road or roads, with all their works, improvements and profits, and all the machinery of transportation used on said roads, are hereby vested in the said company incorporated by this Act, and their successors forever; and the shares of the capital stock of the said company shall be deemed and considered personal estate, and shall be exempt from the imposition of any *tax or burthen* by the State's assenting to this law."

By the Act of the Legislature of 1854, ch. 250, the stockholders of the Baltimore and Susquehanna Railroad Company were *authorized* to unite and consolidate *their company or corporation* with three other railroad companies, all incorporated by the State of Pennsylvania, and whose roads were exclusively within that State, so as to form and constitute one company or corporation, to be called the Northern Central Railway Company, on such terms and conditions, and conformably to such agreements and regulations as the said several companies should respectively determine and adopt, subject to certain express conditions prescribed in the Act. One of the conditions prescribed by the Act was, that the debts and liabilities of the Baltimore and Susquehanna Railroad Company should continue to bind the company and its property as fully as before the consolidation, unless they were assumed by the consolidated company. It was also provided, among other things, that the consolidated company should possess all the corporate powers and *privileges*, and be subject to all the duties and obligations not inconsistent with the Act, which were expressed in the charter theretofore granted to the Baltimore and Susquehanna Railroad Company, and its supplements. In pursuance of this Act, and corresponding Acts of the Legislature of Pennsylvania, conferring authority

State vs. Northern Central Railway Co.

on the three corporations of that State, articles of union and consolidation were agreed on; and, among other things, it was agreed and stipulated among the parties to the compact, that all the estate, real, personal and mixed, and *all the rights, privileges, advantages and immunities* belonging to each of the said corporations, should become and be vested in the body corporate formed by the consolidation. And further, that in consideration of such transfers to the consolidated company, that company assumed upon itself and became bound and liable for all the debts and liabilities of the several companies composing the consolidated company, including the debt of $850,000 of the Baltimore and Susquehanna R. Company to the Mayor and City Council of Baltimore, and interest thereon. In addition to this, the consolidated company was required to assume, for and on account of the pre-existing liabilities of the Baltimore and Susquehanna R. Company, an obligation to pay to the State of Maryland the yearly sum of $90,000, extinguishable at any time within ten years thereafter, upon the full payment of $1,500,000, with all interest accrued ; and to secure which sum to the State a mortgage was required, and was given, covering the entire road from Baltimore City to Sunbury, in Pennsylvania. *Act* 1854, *ch.* 260 ; *State vs. Northern Central R. Co.*, 18 *Md.*, 193.

The articles of union fixed the equivalent values of stock held by the stockholders in the several corporations uniting, and, by the 5th Article, it was agreed there should be issued to the private stockholders of the Baltimore and Susquehanna Railroad Company, certificates for two shares of the capital stock of the consolidated company, "for each one share held by each of said private stockholders respectively ;" and that there should be issued and delivered to the State of Maryland, and to the City of Baltimore, each four thousand shares of the capital stock of such consolidated company; "the said several allotments of stock to the private stockholders, and to the State of Maryland,

and the City of Baltimore, *to be delivered in lieu of the stock held by them respectively* in the Baltimore and Susquehanna Railroad Company," etc.   It is clear, therefore, that the certificates of stock issued by the consolidated company were simply substitutional for those issued by the original company, and that the shares represented the interest only that had been acquired by the original subscription, and are, consequently, held in respect to the capital stock transferred by the original company to the consolidated company.

The consolidated company was organized in 1854, and has been in operation ever since ; and the State authorities appear to have assumed that both the stock and the property of the company were exempt from all taxation, for it was not until recently, under the Acts of 1872, ch. 234, and 1874, ch. 408, that any attempt has been made to force the company to pay taxes either upon its stock or property.   The present proceeding has been taken, under the Acts to which I have referred, to collect of the defendant a tax of one-half of one per cent. on its gross receipts on that part of the road lying within this State, and which formerly belonged to the Baltimore and Susquehanna R. Company.

This claim of the State to tax the gross receipts of the company is resisted by the latter, upon the ground that it stands in the place of the Baltimore and Susquehanna R. Company, and possesses all the powers, rights, privileges, and immunities held and enjoyed by that company before the consolidation, in that portion of the road lying within the State of Maryland ; and that, as by the charter of the original company, all the shares of the capital stock were exempt from the imposition of any tax or burthen, the same exemption extends to the consolidated company, as to the road within the State, and embraces the property sought to be taxed, as well as the shares of stock issued in exchange for those issued by the Baltimore and

Susquehanna R. Company. This claim to exemption is denied by the State, upon the grounds, 1st, that the present defendant was created a new corporation by virtue of the Act of 1854, and that it was under that Act alone, that it derived all its franchises, rights, privileges and immunities; and as by the Constitution of 1850, the Legislature could create no corporation by special Act except on condition that it should be subject to change, alteration or repeal, it follows that it was competent to the Legislature to impose the tax sought to be enforced. And, 2ndly, that even if the shares of the capital stock of the defendant be exempt, the company can claim no exemption from taxation of its corporate property, through the exemption of its stock.

In neither of these positions taken for the State can I concur.

As to the first, that the defendant was, to all intents and purposes, created a new corporation by, and derived all its powers, rights, privileges and immunities from, the Act of 1854, and is therefore subject to any tax that the Legislature may think proper to impose, I think is not sustainable either upon reason or authority.

It must be observed, that the corporations consolidating did not propose to the Legislature to surrender all their franchises, powers, rights, privileges and immunities to the State, to be disposed of as it might think proper ; nor did the Legislature propose to release and discharge them from their duties and obligations. It was simply proposed by the companies, with the sanction and authority of the State, to unite and consolidate themselves, with all their property, franchises, rights, powers, privileges and immunities, under a new organization, and the Legislature was appealed to for authority thus to unite and combine, to accomplish the objects of their original charter. This consolidation when formed resulted in a new corporate body, as matter of convenience as well as of necessity.

But it did not follow that the original corporations were all dissolved, and that their franchises, powers and privileges reverted to the States granting their charters. It is manifest, both from the Act of 1854, and the articles of union and consolidation, that such was not the intention, and neither the State nor the companies ever supposed for a moment, that there was anything more in the Act of 1854, than an authority to unite and consolidate existing corporations on certain conditions; the corporations in no manner being required to abandon or surrender their existing franchises, privileges and immunities. The inducement to the consolidation was the existing rights, privileges and immunities, held by the several corporations consolidating, and with these it was neither within the power, nor was it the purpose, of the Legislature to interfere. It was not the Act of 1854, that produced the consolidation, but it was the articles of union agreed on by the corporations themselves, under the authority of the Act, as the means the better to accomplish the objects for which their several charters were granted. The separate organizations and control were surrendered to the new organization, and became merged therein; but in doing that, it was required that the consolidated company should " bring its organization into agreement and consistency with the terms and conditions of the charters of the several companies, *of which the said consolidated company shall be composed.*" The charters were not only subsisting, but by the express terms of the Act of 1854, all the laws in reference to the Baltimore and Susquehanna R. Company, were made binding and operative upon the consolidated company, so far as its property or its operations might be within the jurisdiction of this State.

In this view of the subject, I cannot resist the conviction, that the case falls exactly within the reason and principle of the case of the *Philadelphia, Wilmington and Baltimore Railroad Company vs. Maryland,* 10 *How.,* 376.

State *vs.* Northern Central Railway Co.

In that case, the railroad company mentioned was a corporation composed of several railroad companies which had been previously chartered by the States of Maryland, Delaware and Pennsylvania ; and which, by corresponding laws of the respective States, were united together, and formed one corporation under the name and style just mentioned.   And in determining upon the rights that this consolidated company acquired under the Act authorizing the consolidation, Chief Justice TANEY, speaking for the Court, said : "Now, as these companies held their corporate privileges under different charters, the evident meaning of this provision is, that whatever privileges and advantages either of them possessed, should in like manner be held and possessed by the new company, to the extent of the road they had respectively occupied before the union ; that it should stand in their place, and possess the power, rights and privileges they had severally enjoyed in the portions of the road which had previously belonged to them.   And this intention is made still more evident by the fourth section of the law, which makes the new corporation responsible for the contracts, debts, obligations, engagements and liabilities at law or in equity of the several companies, and declares that it shall hold and be entitled to all the estate, real, personal and mixed, &c. belonging to or due to the several companies."   The Act authorizing the consolidation in that case, was very similar in substance to the one under which the consolidation of the companies in this case took place.   And in the more recent case, involving a similar question, the same learned tribunal has declared, that "The keeping alive of the rights and privileges of the old company, and transferring them to the new company in connection with the property, indicates the legislative intent, that such property was to be holden in the same manner and subject to the same rights as before.   The owners of the property were to lose no rights by the transfer, nor was the public-

to lose any rights thereby." *Tomlinson vs. Branch,* 15 *Wall.,* 460, 465. The same principle is fully stated and applied in the *Delaware Railroad Tax Case,* 18 *Wall.,* 206.

If, then, the rights, privileges and immunities of the Baltimore and Susquehanna Railroad Company were not surrendered or extinguished, but were kept alive, and transferred to and vested in the consolidated company, as they were originally granted, to be exercised and enjoyed as before the consolidation, it follows that the exemption from taxation, being one of the privileges or immunities to which the original company was entitled under its charter, adhered and passed as incident to its stock or property, and that such exemption was in no manner rendered subject to legislative control by the Act of 1854. By the transfer authorized by that Act and made by the articles of union and consolidation, the franchises, rights, privileges and immunities previously granted, and which were, by the well established law at the time, beyond legislative control, became vested in the consolidated company, not by grant of the State, but under the articles of union, and consequently were not brought within the provision of the Constitution of 1850. The most that the State could claim to do under the constitutional provision, would be either to repeal or modify the Act of 1854; but by neither a repeal of nor alteration in that Act could the Legislature destroy or impair the original franchises, rights, privileges or immunities granted to the Baltimore and Susquehanna Railroad Company, and which are secured under the Constitution of the United States.

As opposed to this view of the subject, the case of the *Commissioners of Washington County vs. Franklin R. Co.,* 34 *Md.,* 159, is relied on. But I am at a loss to perceive how that case can be relied on to support the position of the State in this case. There the original corporation had failed to complete its work, and had become dormant and

defunct ; and long after it had ceased to operate its road, and after the road had gone into dilapidation and ruin, it was sold by trustees for the benefit of creditors. To enable the purchaser to re-establish the road, and to extend it in a different direction from that designated in the original charter, application was made to the Legislature for the Act of 1856, ch. 70. That Act is a re-charter, or, as determined by this Court, in 34 *Md.*, 162, a new charter, from which the defendant in that case derived its name and existence. And there, by express terms of the Act itself, power was reserved to the Legislature to alter, amend or repeal the Act, *and to withdraw and abrogate all the rights, privileges and franchises vested in the company;* and, of course, by accepting the Act the corporators became at once bound by the terms and condition upon which they derived their rights and privileges. I therefore fail to discover the slightest analogy of that case to the present.

Taking it then to be clear that the right of exemption from taxation to which the Baltimore and Susquehanna R. Company was entitled, was transferred to the consolidated company, and remained with the latter company equally as with the first, beyond legislative interference or withdrawal, the next question is, whether the shares of the capital stock of a joint stock corporation, such as the defendant in this case, do not represent all the property of the corporation ; and where all the shares of the capital stock are exempt from taxation, whether such exemption does not extend to and embrace all the corporate property ? Or, to state the question in a different form, whether, if the shares of the capital stock were not exempted, it would be possible to tax the shares *eo nomine,* and, at the same time, and for the same purpose, to tax the corporate property, without substantially imposing a double tax ?

In this State, these questions have been repeatedly decided, and it has been uniformly held, that the property

of the corporation is represented by the stock ; that the taxing of one exempts the other, and that the exemption of one is the exemption of both, unless the exemption be made on the ground of selection, simply to show which is intended to be taxed to the exclusion of the other. It was so decided in the *Tax Cases*, 12 *Gill & John.*, 117, and in the cases of *Gordon vs. City of Baltimore*, 5 *Gill*, 231, and the *City of Baltimore vs. Balto. & Ohio R. Co.*, 6 *Gill*, 288.

Nor can I perceive the supposed error in the reasoning by which such a conclusion was reached.

It is said that, *in one aspect*, the share of a stockholder is something different from the capital stock of the company ; the latter being the property of the corporation, while the former is the individual interest of the stockholder, constituting his right to a proportional part of the dividends when declared, and to a proportional part of the effects of the corporation when dissolved, after payment of its debts. *The Delaware Railroad Tax Case*, 18 *Wall.*, 206, 230. This is certainly the true technical aspect of the relative rights of the corporation, as a legal entity, and the shareholder of its stock. But the joint capital stock is made up of the money subscribed by individual corporators, and is intrusted to the corporation to be used and invested for their benefit. If it be invested in tangible property, such as a road-bed, rolling-stock, depots, and other appendages of a railroad, these are but the means employed to accomplish the end in view, that is, the realization of a surplus profit from the use and disposal of the capital subscribed for the individual stockholders. The capital stock, therefore, of the corporation is the whole undivided fund subscribed or paid in by the shareholders, the legal right to which is vested 'n the corporation, to be used and managed *in trust* for the benefit of the corporators. The value of the shares of stock represents not only the franchise, but the specific articles

of the corporate property of the company ; the real value
of the stock always depending on the condition of the cor-
poration.   If there is an undivided surplus, that, we know,
will always enhance the market value of the stock.   Of this,
many  illustrations might be cited.   This, in my opinion,
is not only the correct view of the subject, but is, I think,
the one generally taken by the authorities, even  those re-
lied on by the State.   *Bligh vs. Brent,* 2 *You. & Coll.*, 268,
294.   That the corporation holds its property and fran-
chises in trust for its shareholders, is a  proposition fully
sustained by the case of *Dodge vs. Woolsey*, 18 *How.*, 331;
and, indeed, the clear logical deduction from that case
would seem to be  conclusive of the question under con-
sideration.   In that case, a bill in equity was filed by a
stockholder of a bank against the directors, and the tax
collector of a tax assessed upon the *assets and property of
the bank*, to restrain the collection of the tax, because of its
unconstitutionality, upon  the distinct ground, that such
tax lessened the value of his stock and diminished the divi-
dends that he would otherwise receive.   And it was dis-
tinctly held, that a Court of equity would exercise its
jurisdiction over corporations and those intrusted with the
administration of their affairs, at the  instance of a stock-
holder, to  prevent any misapplication of the capital or
profits, which might result in lessening the dividends of
stockholders, or the value of their shares ; and that, there-
fore, where the directors of the bank refused to take the
proper measures to resist the collection of a tax, imposed
upon the property of the bank in violation of its charter,
such refusal amounted to a breach of trust, and gave the
shareholder a right to invoke the aid of a Court of equity
for his protection, which was fully afforded in that case.

   There can be no doubt of the right of the State, where
there is no exemption, to make its  election, to tax either
the shares of the stock in the hands of the shareholders,
the capital stock in  the aggregate to  the corporation, or

the specific real and personal property held by the latter ; but it cannot tax in more than one of these modes at the same time, and for the same purpose. To do so would be to impose a double tax.

This principle is well illustrated in two cases, to which I will refer. The first is that of the *Boston Water Power Co. vs. City of Boston*, 9 *Metc.*, 199, in which it was held by the Supreme Court of Massachusetts, that the corporation was not liable to be taxed for its personal estate or income, inasmuch as the *whole value of its personal property* was included in the *shares of the stock*, and, as such, was liable to be taxed to the holders of the shares *eo nomine*. And the second case is that of *Smith vs. Burley*, 9 *N. H.*, 423, where, by law, *the property* of corporations being made taxable to the corporation, in the town where the property was situated, it was held that there was no authority to tax *the stock* in corporations to the owners of the shares, though living in a different town from that where the property was located ; and it was declared by the Court that a taxation of the shares at their appraised value, " would in fact be a *double taxation*, once to the corporation itself, and again to the corporators, which would be unjust, oppressive and unconstitutional." This principle is fully and clearly embodied in our own decisions to which I have referred, and especially the cases in 5 *Gill*, 231, and 6 *Gill*, 288, and upon these I mainly rely.

That the tax imposed upon the gross receipts of the road operates as a burthen upon the stock of the company, can require no argument to prove. It lessens the value of the stock, and diminishes the dividends that would otherwise be declared. It can make no sort of difference, as to the principle involved, if the shares of stock receive dividends at all, though there would be a difference in amounts, whether the tax be laid on the gross receipts, the net receipts, or the dividend fund before or after dividends declared, or upon the dividends specifically

as apportioned to each share of stock.    In either case it is a burthen upon the stock, as it subtracts from its earnings and lessens its value.    The tax is only the more onerous by being imposed upon the gross receipts.    See case of *Iron City Bank vs. Pittsburgh,* 37 *Penn. St.,* 340, and also *State vs. Hood,* 15 *Rich. Law,* 177.

Without extending this opinion to greater length, it is sufficient for me to say that I fully concur in the conclusions arrived at in the very clear and able opinion of the learned Judge of the Superior Court, and I think his judgment ought to be affirmed.