# THE STATE OF MARYLAND

*vs.*

## THE BALTIMORE & OHIO RAILROAD COMPANY,
A BODY CORPORATE.

*B. & O. R. R.: charter rights; tax exemptions; when not
, wiaved.   Corporations: irrepealable contracts with
State.   Duty of State.*

The same degree of fair dealing which is enforced between individuals must be applicable when the parties are the State and a corporation having contractual relations with it.    p. 449

The special charter of the B. & O. R. R. Co., granted by the Act of 1826, constitutes a contract between the Railroad Company and the State, and the tax exemption conferred by section 18 of the charter is not one which it is within the power of the Legislature to modify or repeal, without the assent of the Railroad Company.                              p. 437

To affect a charter given before the Constitution of 1851, there must be both the action of the Legislature and the assent of the corporation.                          pp. 444-445

The acceptance by the B. & O. R. R. Co. of the rights contained in certain ordinances of the Mayor and City Council of Baltimore, amounting to police regulations of the laying of tracks and'switches, which acts were in themselves no new grant of power, but only the regulations by the City of the exercise of powers contained in the B. & O.'s original charter, is not such an acceptance of rights and privileges as to bring the B. &

O. R. R. within the amendment of the State Constitutions of 1851 and 1867, by Chapter 195 of the Acts of 1890, now known as Article 3, section 48, and which provided in substance that every corporation accepting new rights, privileges or powers should be presumed to assent to the repeal of its exemptions from taxation. pp. 438-439

In a mortgage executed by the Railroad Company, there was a covenant that the Railroad Company would discharge all "taxes and assessments, etc., lawfully imposed upon the railroad and other premises or property hereby mortgaged, etc.," provided nothing contained in the section should require the Company to pay any such tax, etc., so long as the Railroad Company in good faith contests the validity thereof, so that the priority of the indenture should be fully preserved in respect to such property. It was: *Held,* this was no surrender of the Company's right to exemption from taxation. p. 438

The statutes relating to the taxation of mortgages have no application to mortgages executed by a railroad company to a trustee to secure bonds sold to investors. p. 438

The Constitutions of 1851 and 1867 do not deny to the State all power to enter into a contract with a corporation, irrepealable in its nature. p. 447

As far as contractual obligations are concerned, the construction of the Washington Branch of the B. & O. R. R. under Chapter 158 of the Acts of 1830 and Chapter 175 of the Acts of 1832, was fully as much a contract between the State and the Railroad Company as was its original charter, and the limitations therein provided, as to the burdens to be imposed upon the corporation, are as amply protected as though contained in the original charter. p. 448

Chapter 155 of the Acts of 1878 was an Act passed for the settlement of counter claims between the State and the Baltimore & Ohio Railroad Company, based upon a sufficient consideration, and contains all the elements of a contract requisite to bring it within the protection of Article 1, section 10, of the U. S. Constitution. pp. 445-448

Such Act is an irrepealable contract, and is unaffected by Chapter 559 of the Acts of 1890, Chapter 120 of the Acts of 1896, or Chapter 712 of the Acts of 1906.        p. 450

The purchase by the B. & O. R. R. Co. of the shares of stock in its Washington Branch which were owned by the State was not an exercise of any new powers or franchise rights, and did not operate as a waiver or surrender of any tax exemptions.

pp. 440-441

*Decided January 13th, 1916.*

Appeal from the Superior Court of Baltimore City. (AMBLER, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Edgar Allan Poe, the Attorney General,* and *Oscar Leser,* for the appellant.

*W. Irvine Cross* and *R. Marsden Smith* (with whom was *Hugh L. Bond, Jr.,* on the brief), for the appellee.

STOCKBRIDGE, J., delivered the opinion of the Court.

This is a suit by the State of Maryland to require the Baltimore and Ohio Railroad Company to pay taxes upon its gross receipts in this State for the years from 1896 to 1908, over and above the amounts already paid, or the difference between the amount of such tax as fixed by the Act of 1878, and the rates established by the Acts of 1890, 1896 and 1906. The suit is sought to be maintained by the State by virtue of the Constitutional Amendment of 1891, which

provided that "any corporation chartered by this State which shall accept, use, enjoy or in any wise avail itself of any rights, privileges, or advantages that may hereafter be granted or conferred by any general or special Act shall be conclusively presumed to have thereby surrendered any exemption from taxation to which it may be entitled under its Charter, and shall be thereafter subject to taxation as if no such exemption had been granted by its charter."

In defense to the action, the Railroad Company sets up the provisions of Chapter 155 of the Acts of 1878, as constituting a contract between the State and the Railroad Company, irrepealable in its nature, and under the protection of the Federal Constitution, Article 1, section 10.

It has been frequently held by this Court that the charter of the B. & O. R. R. Co. granted in 1826, constituted a contract between the Railroad Company and the State, and such a contract that the exemption from taxation conferred by section 18 of that Act was not one which it was within the power of the Legislature to repeal or modify without the assent of the Railroad Company.

There are four grounds upon which the present contention is based, three of which are readily disposed of. One of these arises from the insertion in mortgages executed by the Railroad Company of the covenant that the Railroad Company would pay and discharge all taxes, assessments and governmental charges lawfully imposed upon the lines of railroads "and other premises or property hereby mortgaged, or upon any part thereof, or upon the income and profits thereof, the lien of which would be prior to the lien thereof, so that the priority of this indenture shall be fully preserved in respect of such properties, and will also pay and discharge all taxes, assessments and governmental charges lawfully imposed upon the interest of the trustee, or of the holder of any bond or bonds secured hereby in the mortgaged premises; provided, however, that nothing contained in this section shall require the Railroad Company to pay any such tax,

assessment or charge, so long as the Railroad Company in good faith shall contest the validity thereof." The contention is that by the insertion of this covenant the Railroad Company accepted, used or availed itself of certain general or special rights or privileges, and therefore, under the Amendment to the Constitution, Article 3, section 48, previously referred to, the Railroad Company surrendered its right to exemption from taxation.

With regard to this it is only necessary to say that the point so advanced is conclusively settled by the decision in *Musgrove v. B. & O. R. R.,* 111 Md. 629, in which it was held that the Acts relating to the taxation of mortgages had no application to mortgages executed by a Railroad Company to a trustee to secure bonds sold to investors.

The second contention upon the part of the State was that by the acceptance and user of rights set forth in sundry Ordinances of the Mayor and City Council of Baltimore, there has been such acceptance of rights or privileges as to bring the B. & O. R. R. within the operation of the Amendment to the Constitution of this State. An examination of the Ordinances discloses them to have related for the most part to the laying of switches or spurs which they were expressly authorized to do under the Charter of the Company, when the power was granted to construct lateral lines. The Railroad Company, it is true, was required by the terms of its charter in laying its tracks upon the streets or public ways of Baltimore City, and to do which it was given express authority, to obtain the assent of the Mayor and City Council of Baltimore before the laying of such tracks. This was for the manifest reason that for a proper exercise of the police power, full power had been granted by the Legislature to the municipal corporation over the streets, ways and alleys within the corporate limits, and in the grant of the right for the construction of lateral lines, in order not to interfere with the power of the City of Baltimore for the proper regulation of its streets, it was necessary to place that requirement upon

the Railroad Company.  This was in the exercise of the po-
lice power of the municipal corporation.  The same may be
said of each and all of the other Ordinances referred to; such
for example as the Ordinance granting permission to erect
a shed on the lot bounded by Parkin, Pratt and Poppleton
streets; for establishing the heighth of the Baltimore & Ohio
Central Building; for the construction of a single track on
South Howard street, between Dover and Camden street, and
a similar one for the construction of a single track on Eutaw
street between Barre and Stockholm streets.  Each and all of
these were only the exercise of the police power of the mu-
nicipal corporation.  They conferred no new privilege or
right not already possessed under the original charter of the
Railroad Company and, therefore, they cannot be regarded
as a grant of privileges as that expression is used in the Con-
stitutional Amendment of 1890.  If it had been proposed to .
authorize the Railroad Company to carry on the business of
mining coal, to lay an oil pipe line, or to engage for profit
in different lines of business from those contemplated by the
charter, an entirely different question would have been pre-
sented, but where the sole subject-matter was the exercise by
the municipal corporation of the Mayor and City Council of
Baltimore, of its police power in regulating the manner of
exercise of rights conferred by the original charter of 1826,
there can be no question but that the privilege, if indeed it
was a privilege, was not such an one as was intended to be
embraced, and not within the spirit of the amendment to
the Constitution by Chapter 195 of the Acts of 1890.

The third ground upon which the tax exemption privilege
contained in the original Act of Incorporation is claimed to
have been set aside and nullified, arises out of the fact that
in 1896, the State's holding of 5,500 shares of the capital
stock of the Washington Branch of the B. & O. R. R. was
sold to the Maryland Trust Co. and by it in turn sold and
transferred to the B. & O. Railroad.  The claim is that the
acquisition of this stock constituted the acquirement or exer-

cise of a privilege by the Railroad Company within the terms of the Constitution. The record in the case fails to bear this out. The State was at this time anxious to dispose of its holdings of this stock. The Railroad Company was desirous of acquiring the same. There was no one to whom the stock had greater value than to the Company itself. With the State the question was, how could it realize the largest amount from the interest which it held, and it not unnaturally sought to ascertain the price which the B. & O. R. R. Co. would be willing to pay for it. Legislative action was requisite to effect any sale at all and the session of the Legislature of that year was drawing to a close. The Railroad Company did not make a direct offer to the State, but it did guarantee the State that there should be a bid for the State's holding of the stock, made by a responsible bidder, of at least $2,500,000. If the State had deemed this amount inadequate or that a higher price could be obtained from others, it had full power to take the legislative action which may have been requisite to enable the Board of Public Works to have disposed of this stock to any outside parties. That it was not so considered by those who were the officials of the State at the time, is shown in the action which was taken, but even under the action taken, though the time was short, it was ample for outside parties to have interposed a bid larger than the $2,500,000. What actually did happen was a bid for the stock by the Maryland Trust Co. of the sum named for the stock and it was sold at that figure. It makes no difference, so far as this case is concerned, whether the Maryland Trust Company was purchasing for its own account or whether it was acting for and on behalf of the Railroad Company. The real question is, was it a fair sale, made in a manner sanctioned by law and for an adequate price in the light of all the facts as those facts were then understood? These must be answered in the affirmative and, therefore, the sale by the State of its interest in the Washington Branch of the B. & O. R. R. Co. was not the granting of any

privilege or right within the contemplation of the constitutional amendment provided by Chapter 195 of the Acts of 1890.

Suppose, for example, instead of the method which was adopted, the State had advertised for bids for the stock to be filed with the Board of Public Works, by a certain date, and on the date named, a number of bids had been filed which when opened disclosed that they were made by responsible bidders, and the State officials had accepted the most advantageous offer, and disposed of the stock; that the stock so acquired had been subsequently offered for sale on the stock boards of New York, Baltimore and other cities and had there been purchased by or on behalf of the Railroad Company, would anyone claim for one moment that thereby the Railroad Company had acquired a peculiar privilege which would destroy important and valuable charter rights? If not, it is impossible to see how any other or different result can flow from what was actually done.

There now remains for consideration the most important question involved in this case, and that is the Act of 1878, Chapter 155. The title of that Act was as follows:

"AN ACT to adjust and settle finally by an agreement all pending controversies between the B. & O. R. R. Co. and the State of Maryland, by subjecting the franchises and property of said company within this State to taxation for State purposes to a certain extent and by providing for the payment of certain indebtedness of the said B. & O. R. R. Co. to the said State, and for the establishment by contract or certain rates of toll and transportation for coal, lumber, pig iron, ores of all kinds and stone, transported by the said B. & O. R. R. Co. to the basins of the Chesapeake and Ohio Canal Company, at or near Cumberland and by providing on certain conditions for the release of the right of the State to any proportion of the moneys received by the said Company for the transportation of passengers on its railroad between Baltimore and Washington, otherwise than

by way of dividends upon its stock in the Washington Branch Railroad of said company."

Following the title were two preambles, the second of which was in this language:

"Whereas, It is deemed by this General Assembly to be just and proper as an equitable settlement of all controversies now pending between said company and the State, that the said company *in consideration of its release* from the said contract and in lieu of its obligation of payment thereunder, *shall agree to a modification of its contract with the State* for exemption from taxation, as provided by the eighteenth section of the Act of 1826, Chapter 123, incorporating said company, by submitting to taxation to the extent of one-half of one per centum of its gross receipts within the State as hereinafter provided."

The Act then begins as follows:

"Section 1. *Be it enacted by the General Assembly of Maryland,* That all the franchises and property of every description and gross receipts of the B. & O. R. R. Co. within the State of Maryland, shall be subject to taxation for State purposes to the extent of an annual tax of one-half of one per centum on the gross receipts of its railroad and branches within the State, including its Metropolitan Branch R. R. and from its entire Washington Branch R. R. and from all other sources within this State, but to no further or greater extent nor otherwise; and provided, the said company, in consideration of the release of its obligation to pay to the State the one-fifth of its gross receipts for the transportation of passengers over the Washington Branch of its road, as provided by the eighth section of the Act of 1832, Chapter 175, shall agree on its part in the manner and upon the terms hereinafter provided, to modify its contract for exemption from taxation as contained in the 18th section of the Act of

1826, Chapter 123, incorporating said company, by submitting all its franchises and property of every description, and all its gross receipts within the State of Maryland to taxation for State purposes to the extent and in the manner above named, and to no further or greater extent nor otherwise, and shall also accept the provisions of this Act in the manner hereinafter provided, then no other *further or greater tax or burden for State purposes shall ever hereinafter be levied or imposed by the authority of this State or by any law thereof, upon any of the franchises or property of any description or receipts whatsoever of said company;* provided that nothing in this Act shall be construed as exempting any property or franchises of the said railroad company from taxation for county and municipal purposes, which by existing laws and the decisions of the Court of Appeals of this State, is now held liable to taxation; and the exemption from taxation created and provided for by the 18th section of the Act of 1826, Chapter 123, entitled 'An Act to incorporate the B. & O. R. R. Co.,' be and the same is hereby declared to be modified to the extent of substituting the tax imposed upon said company by the second section of this Act, in lieu of the tax imposed by the 8th section of the Act of 1832, Chapter 175, but to no further or greater extent, nor otherwise."

At the time of the passage of this Act, there were numerous contentions pending between the State and the B. & O. R. R. Co., and from the title it appears that it was the purpose of the Act to bring about an adjustment of all the matters in dispute at that time. The Railroad Company assented to a tax of one-half of 1% upon its gross receipts in the State of Maryland, in consideration, in part, of being relieved from a capitation tax of 25c. per passenger, payable upon persons traveling over the Washington Branch. The rate of the tax on gross receipts as fixed by this Act was identical with the rate of tax at that time imposed by law upon

the gross receipts of other similar corporations. When this Act was passed the Constitution of 1867 was in force, which like that of 1851 prohibited the granting of an irrepealable or unamendable charter. Charters granted prior to 1851 and which in their nature amounted to contracts beetween the State and a corporation, under the decision of the *Dartmouth College case,* remained valid and unamendable except by consent of both parties. This leads directly to the question:

Was or was not the Act of 1878 in effect a modification, tantamount to the new grant of a new charter to the B. & O. R. R. Co., accepted as such by the Railroad Company, or did the acceptance of the ·Act bring the original charter, or the Act of 1878 within the operation of the Constitutions of 1851 and 1867? Was or was not the Act of 1878 *ultra vires* so far as the Legislature was concerned; and has or has not the tax provision contained in the Act of 1878 been repealed in whole or in part or amended by subsequent Acts of the Legislature?

To effect a modification of the charter there were requisite both the action of the Legislature and the assent of the Railroad Company. In the General Assembly of 1876, an Act was passed, Chapter 229, by which the tax exemption on the property of the Railroad Company or any of its branches was repealed, and it was provided that if the Railroad Company accepted that Act, it should be relieved of the capitation tax on the Washington Branch. This Act, however, was not accepted by the Railroad Company. It preferred to pay the capitation tax and retain the exemption which section 18 of its charter conferred. This was but two years prior to the Act of 1878. The Legislature must have known in passing the Act of 1878 that the Railroad Company had declined to accept the provision which had been proposed to be made by the Act of 1876, and while not so expressed, either in the title or in the body of the Act of 1878, it is perfectly apparent that this Act was intended to cover not merely what was cov-

ered in the Act of 1876, but a large number of other matters
as well.    It was an Act supported by a large and valuable
consideration, and the first question of importance is: Is it
to be regarded in the light of a statutory enactment and thus
subject to the power of repeal, modification or amendment,
by a subsequent Legislature; or is it to be considered in the
light of a contract between the State and the Railroad Com-
pany, and, as such contract, within the protection of the pro-
vision of the Federal Constitution, Article 1, section 10 ?

In *New Jersey* v. *Yard,* 95 U. S. 104, JUSTICE MILLER,
in delivering the opinion in that case, uses the following lan-
guage:

"It has become the established law of this Court that a
legislative enactment in the ordinary form of a statute may
contain provisions which when accepted as the basis of action
by individuals or corporations become contracts between them
and the State within the protection of the clause of the Fed-
eral Constitution * * * .  The Legislature may be supposed
to exercise its power of regulating the burdens which are to
be borne for the public service.    In this case it could have
modified from time to time as the legislative discretion might
determine, or it might be a contract founded on a fair consid-
eration from the party concerned to the State, and which in
that case would be beyond the power of the State to impair."

So in the present case there was a well understood subject-
matter of contract.    There was no grant of any new right by
the State to the Railroad Company, though there was a re-
linquishment of an existing right in return for which the
State acquired a valuable right not theretofore possessed.

The Act contemplated a settlement of counter claims be-
tween the State and the Railroad Company arising out of a
number of different contentions.    Can it be believed that it
was intended by either party, the Railroad Company or the
State, that one was to be bound forever and the other only
for a day?    Does anyone suppose that the Act of 1878 would
have been accepted by the Railroad Company and acted upon

and the payment made to the State provided for in it, and
that the State had an option at any time thereafter to say
that it was bound or not, according as some subsequent Legis-
lature might determine?

The State has relied, to a large extent, upon the decisions
of this Court in the cases of *Northern Central Ry. Co.,* in 44
Md. 131 and 90 Md. 447. The two cases, however, are rad-
ically different from the one now presented to the Court.
The Northern Central Ry. Co. in 1880 procured the passage
of an Act for which the Act of 1878 was the model, and this
was subsequently asserted by the State to be within the power
of succeeding Legislatures to alter, amend or repeal. That
view was adopted both by this Court and by the Supreme
Court of the United States, *N. C. Ry. Co.* v. *State of Md.,*
187 U. S. 258, but in the opinions filed by JUDGE SCHMUC-
KER and JUSTICE WHITE, the conclusion reached resulted
from the fact that the Northern Central Ry. Co. acquired
its rights and immunities of taxation from the Acts of 1854,
Chapter 250, or after the adoption of the Constitution of
1851, and therefore, these immunities then granted were a
subject-matter over which the Legislature had full power
reserved to it to alter or amend.

In the present case the immunity from taxation arose from
the Act of 1826, which was beyond the power of the Legis-
lature to alter, amend or repeal, except by the assent of the
B. & O. R. R. Co. The Act of 1878 granted no additional
immunity to the Railroad Company above that contained in
its original charter. On the contrary, it, to a considerable
degree, abridged that right because, by the assent of the
Railroad Company, it subjected the gross receipts of the
Company, whether upon the Main Line or upon the Wash-
ington or Metropolitan Branches, to taxation, at a specified
rate from which the Main Line would certainly have been
exempt as also the Washington Branch, as will appear later,
while with regard to the Metropolitan Branch, the issue was
more debatable. The Constitutions of 1851 (Article 3, sec-

tion 47) and 1867 (Article 3, section 48) cannot be given the construction that the State is without the power to *enter into a contract* irrepealable in its nature. Such a construction would make it absolutely unsafe to contract with the State upon any matter.

In the case of *Stearns* v. *Minnesota,* 179 U. S. 223, the Supreme Court of the United States, speaking through Justice Brewer, said: "The power of amendment has its limitations or rather that an amendment may not be wholly as to the right of the State and absolutely ignoring the right of the other party to the contract, has been adjudged by this Court in *Louisville Water Co.* v. *Clark,* 143 U. S. 1." * * * "A contractual exemption of the property of the Railroad Company in whole upon consideration of a certain payment cannot be changed by the State so as to continue the obligation in full and at the same time deny to the Company, either in whole or in part, the exemption conferred by a contract."

In the case of the *State* v. *B. & O. R. R. Co.,* 48 Md. 49, a suit had been brought to regulate by the State the amount of the gross receipt tax imposed by the Act of 1872, Chapter 234, and in that case it was held by the Court that if the gross receipt tax was to be regarded as a tax upon the franchise it was invalid, except with reference to the Metropolitan Branch, which it was there held had been constructed not under the original charter, but under the Acts of 1865, Chapter 70, and Judge Robinson lays down the very broad rule that the gross receipts derived from all properties held or owned under the franchises as granted subsequent to the granting of the original charter upon which no exemption was engrafted were liable to taxation under the provisions of the Act of 1872. This suggestion leads to a consideration of a portion of the argument submitted to us by the *Attorney General* to the effect that the Act of 1878 might be divisible in its operation and that the State would be limited so far as the taxation of the Main Line was concerned to the one-half of 1%, but not so limited with regard to the Washington or

Metropolitan Branches. These two Branches do not stand in
exactly the same position. The Washington Branch was con-
structed under the authority of Acts of the Legislature of
1830, Chapter 158, 1831, Chapter 330, and 1832, Chapter
175, from which it appears that the State was directly inter-
ested in the construction of that Branch, and that in consid-
eration of its construction by the Railroad Company the
State undertook to further the construction by a liberal sub-
scription to a separate stock to be issued for the building of
that Branch of the road. So far as the contractual elements
are concerned the construction of the Washington Branch
was fully as much a contract between the State and Railroad
Company as was the original charter. The State provided
a portion of the capital, was to receive a capitation tax upon
each passenger carried, while the Railroad Company was to
do the actual construction work and the operation of it after
construction. Every possible consideration which sustained
the charter of the B. & O. R. R. Co. as a contract between
the State of Maryland and the corporation, obtains with even
greater force in relation to the Washington Branch. This
Branch was constructed and was operated by the Railroad
Company in accordance with its undertaking and the capita-
tion tax was paid down to 1878.

The Metropolitan Branch, while it might perhaps have
been constructed as a lateral, under the terms of the original
charter, has already been held by this Court to have been
constructed under a franchise granted in 1865.

Therefore, it follows that the present contention of the
State could not be maintained as far as the Washington
Branch is concerned, even if sound with respect to the Met-
ropolitan Branch. But can that Branch be segregated so as
to make an increased rate of taxation on gross receipts pro-
vided by the Acts of 1890, 1896 and 1906 apply, or is the
Act of 1878 indivisible and does it constitute a contract in
which one part is interdependent upon the others, so that it
must be sustained in its entirety, if sustained at all? An

examination of the Act of 1878 clearly discloses that its object and purpose was to reach a final adjustment of matters in dispute between the State and the Railroad, not an adjustment of some and a leaving of others open and subject to future unknown modifications. If it be assumed that the gross receipts of the Metropolitan Branch were liable to taxation under the Act of 1872, and any subsequent alterations or modifications thereof, while the gross receipts of the Main Line and the Washington Branch were not so subject to taxation, is it to be supposed that the Railroad Company would have assented to the taxation of the exempt portions of the line, and still. leave the Metropolitan Branch liable to any rate of taxation that any subsequent Legislature might·impose?

Is it not more compatible with the terms of the Act of 1878 to read it as meaning, that in consideration of a rate of taxation on gross receipts established by that Act for the Metropolitan Branch, which should not thereafter be subject to modification, the assent was given to subject to taxation receipts of the Railroad Company which were then exempt?

The same rule of fair dealing which is enforced between individuals must be applicable where the parties are the State and a corporation having contractual relations with the State. The State can no more retain the benefits derived from its agreement and repudiate the benefits which are derived or to be derived by the other party to the contract, than can the individual.

The Railroad Company submitted tables of figures designed to show that under the agreement the State had received more than it would have done if taxes had been paid upon the gross receipts under the Acts of 1872, 1890, 1896 and 1906, upon such portions of the line as could properly have been subjected to such taxation, and retained its exemption upon so much as was exempted by its charter.

We are not now concerned with the question whether the State has received more or has received less than it would

have received if the Act of 1878 had never been passed, but whether that Act was one within the power of the State to pass, and, if so, then what are the legal rights of the parties. And from the considerations set out in this opinion, it follows that the Act of 1878 was not *ultra vires,* but was within the power of the State to adopt; that when adopted, assented to and acted upon by the Railroad Company in strict accordance with its terms, it became an irrepealable contract, and was therefore unaffected by the Acts of 1890, Chapter 559; 1896, Chapter 120, and 1906, Chapter 712; that the consideration for the contract was a sufficient consideration to support it, and that it contains all the elements requisite to bring it within the protection of the Constitution of the United States, Article 1, section 10.

In view of the conclusions reached upon the several issues presented in this case, it is not deemed necessary to discuss the various prayers in detail, since they embody no prejudicial and therefore no reversible error, and the judgment of the Superior Court of Baltimore City will be affirmed.

*Judgment affirmed.*