JOSEPH H. A. ROGAN, ET AL., *v.* BALTIMORE AND OHIO RAILROAD CO.

[No. 70, October Term, 1946.]

*Decided March 12, 1947.*

*Dissenting Opinion filed March 19, 1947.*

48

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLNS, GRASON, HENDERSON, and MARKELL, JJ.

*Richard W. Emory*, Deputy Attorney General, and
*Hall Hammond*, Attorney General, with whom was
*Joseph D. Buscher*, Assistant Attorney General, on the
brief, for the appellants.

*John S. Stanley* and *D. Heyward Hamilton, Jr.*, with
whom were *Hershey, Donaldson, Williams & Stanley*,
on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This case calls for construction of the Maryland
statute, Laws of 1878, Ch. 155, which imposes an annual
franchise tax of one-half of one per cent. on the gross
receipts of the Baltimore and Ohio Railroad Company
within the State of Maryland.

The railroad company was incorporated by the Legis-
lature in 1826 to build a railroad from the City of Bal-
timore to the Ohio River. Perpetual exemption from
taxation was given by the charter on shares of capital
stock of the company. Laws of 1826, ch. 123, sec. 18.
The railroad was built through Ellicott City, Monocacy
Junction, Harper's Ferry and Cumberland to the West.
In 1830 the Legislature authorized the company to con-
struct a branch line from the Main Line to the City of
Washington, and in 1832 imposed an annual tax of one-
fifth of the whole amount received for the transporta-
tion of passengers on the Washington Branch. Laws
of 1830, ch. 158; Laws of 1831, ch. 330; Laws of 1832,
ch. 175. In 1865 the Legislature authorized the com-
pany to construct another branch, the Metropolitan,
from some suitable point between Monocacy Junction
and Knoxville, Maryland, to the District of Columbia
in order to facilitate a more direct communication from
the West to the City of Washington. Laws of 1865, ch.
70. In 1868 the company refused to pay the tax on
the fares from passengers on the Washington Branch,
in view of the decision of the United States Supreme

Court in *Crandall v. State of Nevada,* 6 Wall. 35, 18 L. Ed. 744, 745, that the Nevada statute imposing a capitation tax upon every person leaving the State by any railroad or stage coach was unconstitutional, inasmuch as every citizen of the United States has the right to pass from one State to another without interruption. But the Nevada tax was a tax "on the transportation," while the Maryland tax was compensation "for the transportation," or for the franchises enjoyed by the carrier. Hence, in *State v. Baltimore and Ohio R. Co.,* 34 Md. 344, the Court of Appeals held that the exaction by the State of one-fifth of the passenger fares collected on the Washington Branch was not a capitation tax, or tax upon the passenger for the right to travel, but a franchise tax imposed upon the corporation, and therefore was free from constitutional objection. That decision was affirmed by the Supreme Court in *Baltimore & Ohio R. Co. v. State of Maryland,* 21 Wall. 456, 22 L. Ed. 678, 684.

In 1872 the Legislature enacted the General Gross Receipts Tax Law imposing an annual tax of one-half of one per cent. on the gross receipts derived by railroads worked by steam within the State of Maryland. The gross receipts from the Washington Branch were exempted therefrom as long as the company paid the tax imposed by the Legislature of 1832. Laws of 1872, ch. 234. The Comptroller requested the Northern Central Railway, the Philadelphia, Wilmington and Baltimore Railroad Company and the Baltimore and Ohio to report the amount of receipts from passenger and freight transportation; but none of the railroad companies had segregated the receipts derived within the State from the receipts derived outside the State. In 1873 the Comptroller, evidently recognizing the impracticability of segregating the receipts, asked the companies to report the length of line within the State and the entire length of line of the railroad. With this information the Comptroller apportioned the gross receipts.

50

In 1876 the Court of Appeals in *State v. Northern Central Ry. Co.*, 44 Md. 131, held the Gross Receipts Tax Law valid; and in *State v. Philadelphia, W. & B. R. Co.*, 45 Md. 361, 384, 24 Am. Rep. 511, found that, while perfect equality in the apportionment of taxes on gross receipts is unattainable, the line-mile basis of apportionment was apparently fair and reasonable. In 1876 the State entered suit against the Baltimore and Ohio for taxes assessed on gross receipts from all sources except the Washington Branch for the period from April 1, 1872, to December 31, 1872, and for the year 1873. The taxes were assessed by the line-mile method of computation. In that case the Court of Appeals held that, while the gross receipts from the Main Line were exempt from taxation under the provisions of the charter of 1826, the gross receipts from the Metropolitan Branch were not exempt because it was built under authority of the Act of 1865, which did not grant an exemption. The Court further stated that, since the receipts from the Metropolitan Branch had been commingled with the receipts from the Main Line, the only rule by which to approximate the receipts of the Metropolitan Branch was to make them bear the same proportion to the entire receipts derived from the Main Line in the State as the number of miles of the Metropolitan Branch bears to the entire length of the railroad. *State v. Baltimore & Ohio R. Co.*, 48 Md. 49, 79. From that decision the company appealed to the United States Supreme Court; but before the case was reached, the Legislature of 1878 passed the Settlement Act which is now before us.

The purpose of the Settlement Act of 1878 was to adjust and settle finally by agreement all pending controversies between the Baltimore and Ohio Railroad Company and the State of Maryland. The Act provides that, if the company would agree to modify its contract for exemption from taxation by submitting all its franchises and property and all its gross receipts within the State to taxation for State purposes to the extent of an annual tax of one-half of one per cent. on the gross

receipts of its railroads and branches within the State, then no other tax for State purposes would ever be imposed by the State upon any of the franchises or property or receipts of the company. The Act further provides that upon failure of the company to comply with all the requirements of the Act before July 1, 1878, the Act shall be null and void, and the State shall enforce all its claims against the company in the same manner as if the Act had never been passed. The company, by agreeing to submit its gross receipts to a tax of one-half of one per cent., surrendered a part of its charter exemption, and thereafter the State had the right to tax gross receipts at that rate. The company was relieved from its obligation to pay one-fifth of the amount received for the transportation of passengers on the Washington Branch, but the State had the right to tax receipts from that branch at the rate of one-half of one per cent. This Court held in *State v. Baltimore & Ohio R. Co.*, 127 Md. 434, 450, 96 A. 636, that since the company assented to the Act and complied with its requirements, it became an irrepealable contract. A legislative enactment in the ordinary form of a statute may contain provisions which, when accepted as the basis of action by individuals or corporations, become a contract between them and the State within the protection of the clause of the Federal Constitution, art. 1, sec. 10, that no State shall pass any law impairing the obligation of contracts. *State of New Jersey v. Yard*, 95 U. S. 104, 24 L. Ed. 352; *State Tax Commission v. Baltimore & Ohio R. Co.*, 179 Md. 125, 133, 17 A. 2d 101.

In 1939 Governor O'Conor, upon request of the Legislature, Laws of 1939, ch. 262, appointed the Maryland Tax Revision Commission to investigate thoroughly the systems of taxation in force in this State; and in 1941 this Commission recommended, among other things, that the State abandon the line-mile method and consider the mileage of all the tracks and sidings. Its recommendation as to computation of the gross receipts of the Baltimore and Ohio Railroad Company was as follows: "No method of apportionment is prescribed or

indicated by the Settlement Act. The company apportions its operating revenues, intrastate as well as interstate, on a road-mileage basis, following the plan prescribed by Section 95 when no other mode of apportionment is required by the State Tax Commission. This method may have produced reasonably fair results when it was first adopted, but under present day conditions it is universally regarded as too crude for use except in the simplest situations. All-track mileage would produce more accurate results with no increase in the burden of the computation." Report, Maryland Tax Revision Commission of 1939, p. 88.

Acting upon that recommendation, the State Comptroller adopted the all-track mileage method of apportionment, and assessed a tax of $158,263.29 on the Baltimore and Ohio for the year ending September 30, 1942. On December 28, 1942, the company presented a check for $103,072.94 to the Treasurer of the State of Maryland for taxes computed as in previous years on the line-mile basis, and he accepted it conditionally. In June, 1943, the Comptroller notified the company that the correct amount of tax was $158,263.29. The company protested the assessment, but the Comptroller insisted on payment of an additional sum of $55,190.35. On September 24, 1943, the company paid to the State Treasurer the sum of $55,190.35 under protest. Our Revenue and Taxes Act provides that whenever any person shall have erroneously or mistakenly paid to any State agency authorized to collect the same, more money for special taxes than was properly and legally payable, or shall have paid any special taxes which were erroneously or illegally assessed or collected, or in any manner wrongfully collected, he may file with such agency a written claim for the refund thereof. The person filing claim for refund shall be entitled to appeal from the final action of such agency to the State Tax Commission, and from the action of the Commission to the Courts of this State. Code, Supp. 1943, art. 81, secs. 162A, 162B, 162C. On September 29, 1943, the Baltimore and Ohio Railroad Company filed claim for refund

with the State Tax Commission, but in January, 1946, the Commission disallowed the claim. From the decision of the Commission, the company appealed to the Circuit Court of Baltimore City. The Chancellor reversed the order of the Commission, and decreed that the Comptroller should be directed to cause to be returned the sum of $55,190.35, with interest from September 27, 1943. The chancellor took the view that it was intended that the line-mile method of apportionment should be used perpetually in computing the gross receipts within the State, and that the State has no right to adopt the all-track mileage method. The Commission thereupon appealed to this Court.

The cardinal rule of statutory construction is that the intention of the Legislature must be sought first of all in the words of the statute itself. If these words convey a clear and sensible meaning, the statute must be enforced exactly as it stands, and cannot be varied by reason of any considerations found outside the statute or based on mere conjecture. If the language of a statute is open to either of two constructions, the court should adopt that construction which will best tend to make the statute effectual and produce the most beneficial results. We cannot accept the view that the provision for the tax on gross receipts is ambiguous merely because it does not prescribe how the gross receipts within the State are to be computed. In *Baltimore Union Passenger Ry. Co. v. Mayor, etc., of the City of Baltimore,* 71 Md. 405, 414, 18 A. 917, where the railway company was taxed by the city on gross receipts from passenger travel within the city limits, this Court held that it was the city's duty to adopt some method for determining with reasonable accuracy what proportion of the revenues should be deducted as not liable to tax. The General Gross Receipts Tax Law has been in force since 1872. Code 1939, art. 81, sec. 95. But this statute does not affect the Act of 1878, ch. 155, which was passed for the settlement of claims between the State and the Baltimore and Ohio Railroad Company. *State v. Baltimore & Ohio R. Co.,* 127 Md. 434, 450, 96 A. 636.

In the instant case the chancellor undertook to write into the Act, after the words "gross receipts within the State," the words "to be computed by the line-mile method of apportionment." Interpolation of words, to make a statute include matters which the Legislature did not expressly include, invades the function vested solely in the Legislature, however plausible may be the conjecture that those matters were within the legislative purview.

Even though a certain provision, which has been omitted from a statute, appears to be within the obvious purpose or plan of the statute, and to have been omitted merely by inadvertence, nevertheless the court is not at liberty to add to the language of the law; and the court must hold that the Legislature intended to omit the provision, however improbable that may appear in connection with the general policy of the statute. *Scaggs v. Baltimore & Washington R. Co.*, 10 Md. 268, 277. When there is nothing in the context of a statute to attach a different meaning to the words so as to be capable of expressly embracing the case before the court, the court cannot extend the statute to that case, unless it falls so clearly within the reasons of the enactment as to warrant the assumption that it was not specifically enumerated among those described by the Legislature, only because it may have been deemed unnecessary to do so. If the case is omitted in the statute because not foreseen or contemplated, it is a *casus omissus,* and the Court, having no legislative power, cannot supply the defects of the enactment. Even if a statute is incomplete, so that it cannot be complied with without additional provisions which are not indicated by the act itself, the court cannot supply such defects so as to give validity to the act. *State ex rel. Mickey v. Reneau,* 75 Neb. 1, 104 N. W. 1151, 106 N. W. 451.

Undoubtedly the Act of 1878 is a legislative contract. In construing the provisions of a legislative contract, like any other statute, a fair and liberal interpretation should be given to the language employed. It is the duty of the court to construe a contract in such a way as to

accomplish the intention of the parties, rather than to overthrow it by any strained construction. But where a contract is plain and unambiguous, there is no room for construction, for the parties must be presumed to have intended what they expressed. *Mayor and City Council of Baltimore, for Use of Lehigh Structural Steel Co. v. Maryland Casualty Co.*, 171 Md. 667, 190 A. 250. In the Charles River Bridge Case, *Charles River Bridge v. Proprietors of Warren Bridge*, 11 Pet. 420, 544, 9 L. Ed. 773, Chief Justice Taney applied the rules of the common law in the construction of legislative grants, and declared that charters are to be construed most favorably to the State, and that in grants by the State nothing passes by implication. All rights which are asserted against the State must be clearly defined, and cannot be raised by inference or presumption. Acts of incorporation and statutes granting franchises or special benefits or privileges to corporations are construed strictly against the corporation. If the charter of a corporation is silent about a power, the power does not exist. Where, on a fair reading of the statute, a reasonable doubt arises as to the proper construction to be given to it, the doubt should be resolved in favor of the State. Where the statute is plain and unambiguous, and the intention of the Legislature can be clearly ascertained, it is the duty of the court to give effect to it as it is written. *In re Binghamton Bridge*, 3 Wall. 51, 18 L. Ed. 137, 143; *Wilmington R. Co. v. Reid*, 13 Wall. 264, 20 L. Ed. 568.

It is conceded that the Act of 1878 is a contract which succeeding Legislatures may not alter or impair by imposing taxes for State purposes of a different type, or at a higher rate. *State v. Baltimore & Ohio R. Co.*, 127 Md. 434, 96 A. 636; *Powers v. Detroit, G. H. & M. R. Co.*, 201 U. S. 543, 26 S. Ct. 556, 50 L. Ed. 860. Compare *State v. Northern Central R. Co.*, 44 Md. 131; Constitution of Md. of 1851, art. 3, sec. 47; Constitution of Md. of 1867, art. 3, sec. 48. The court cannot presume that the Legislature has fettered its power for the future, except upon clear and irresistible evidence that such, in the particular instance, was the actual and deliberate

intention. *Providence Bank v. Billings & Pittman*, 4 Pet. 514, 561, 7 L. Ed. 939, 956; *Mobile & O. R. Co. v. State of Tennessee*, 153 U. S. 486, 14 S. Ct. 968, 38 L. Ed. 793; *City of St. Louis v. United Rys. Co.*, 210 U. S. 266, 28 S. Ct. 630, 52 L. Ed. 1054.

The company contends that the circumstances surrounding the passage of the Settlement Act indicates that the railroad company understood that the line-mile method of apportionment would be used perpetually to estimate the gross receipts derived within the State. The company vigorously urged that this method was used by the Comptroller prior to the passage of the Act. The measure was introduced in both the State Senate and House of Delegates, and was given careful consideration by the members of the Legislature. Numerous amendments were offered in both Houses, but none related to the determination of the gross receipts within the State. It was the Senate bill which was passed and approved by Governor Carroll. Nothing has been found in either the Senate or House Journal making any reference to the gross receipts within the State, except that they would be subject to the tax of one-half of one per cent. Throughout the prolonged negotiations which led to the passage of the Act and its acceptance by the company, the company was represented by eminent lawyers, and it is reasonable to suppose that they would have specified that gross receipts were to be approximated on the line-mile basis of apportionment if that had been the intention of the company and the Legislature.

Of course, if a custom has been recognized by a statute, either expressly or by necessary implication, it will thereby receive vitality, and the right claimed under it may be conferred by the statute. But it is not permissible to show that the lawmakers knew of a custom existing at the time a law was remodeled in order to maintain from their silence that they intended to sanction such custom. In *Delaplane v. Crenshaw & Fisher*, 15 Grat., Va., 457, 475, where reports of committees in the Legislature of Virginia were relied on to show that a certain usage was known to the members of the Legislature, and

that the statute was based upon that usage, Judge Lee, speaking for the Virginia Supreme Court of Appeals, forcefully stated: "And as the Constitution vests the whole lawmaking power in the Legislature, it is difficult to see how comparatively a few individuals can make a law by custom which shall be binding upon the public at large. It would savor more of encroachment upon the rights of the people to say that they should be bound by a law which had never been assented to by them through their proper representatives. And if the Legislature were to declare by express enactment that custom might make law, it might well be questioned whether such a provision would not be void for the want of a power in the Legislature to delegate to a few men authority to make a law by getting up a custom."

In the instant case the railroad company was not given a vested right to a perpetual method of computation. The Act was silent as to method. The Tax Revision Commission of 1939 found that the Comptroller's office had no experience in administering the gross receipts tax "other than receiving the report from the railroad company and accepting payment of the tax by due date." Thus, the Comptroller passively received the railroad's annual reports from 1878 to 1942. The Commission, after a thorough study of the systems of taxation in this State, reported that the all-track mileage basis for computing the gross receipts of the Baltimore and Ohio within the State would be more accurate and just. If the line-mile method is grossly inaccurate, the tax officials of the State have not only the right but the duty to adopt a method which will be more accurate. In *Wallace v. Hines,* 253 U. S. 66, 40 S. Ct. 435, 436, 64 L. Ed. 782, where the tax was a special excise tax upon doing business in North Dakota, the State fixing the value of the total property of each railroad by the value of its stocks and bonds, and assessing that proportion of such value which the main-track mileage within the State bears to the main-track mileage of the entire line, the Supreme Court struck down the tax as repugnant to the Constitution, because it resulted in too great a ratio of the property of an interstate

carrier being attributed to a particular State. Justice Holmes said in that case: "The State is mainly agricultural. Its markets are outside its boundaries and most of the distributing centers from which it purchases also are outside. It naturally follows that the great and very valuable terminals of the roads are in other States. So looking only to the physical track the injustice of assuming the value to be evenly distributed according to main track mileage is plain."

The mere fact that the line-mile basis has been a convenient and fairly accurate method and has been accepted by the officials of the State for more than 60 years for the Baltimore and Ohio Railroad, does not make it the only way that can ever be used to measure the gross receipts within the State. Where the language of a statute is susceptible of two reasonable constructions, an administrative practice which has been followed by officials of the State for a long period of time has a very persuasive influence on the judicial construction of the statute. But where the language is plain and unambiguous, the judicial construction cannot be controlled by extraneous considerations. No custom, however venerable, can nullify the plain meaning and purpose of a statute. The statute now before us is silent on the way in which the gross receipts within the State are to be measured. It is undisputed that the line-mile method has become inadequate and unfair. Therefore, the State Comptroller has the right to adopt a more satisfactory method. In spite of an unvarying administrative practice, the Court should not sanction a method of computation which tolerates an evasion of taxes. Any alleged failure of taxing officials in previous years to assess the gross receipts accurately cannot abolish the duty imposed by law upon their successors, or control the judicial construction of the statute. *Bouse v. Hutzler*, 180 Md. 682, 687, 26 A. 2d 767, 141 A. L. R. 843; *Vicksburg, S. & P. R. Co. v. Dennis*, 116 U. S. 665, 6 S. Ct. 625, 627, 29 L. Ed. 770.

*Decree reversed and case remanded for the passage of a decree in accordance with this opinion, with costs.*

MARKELL, J., filed the following dissenting opinion:

The Act of 1878 is "An Act to adjust and settle finally, by an agreement, all pending controversies" between the B. & O. and the State. The question is whether the principal method of "settling all controversies," *viz.*, "by subjecting the franchises and property of said Company within this State to taxation for State purposes *to a certain extent,*" (1) accomplished its purpose of settling controversies or (2) unsettled all controversies and created endless new controversies by subjecting the company to taxation to an utterly uncertain extent. (Italics supplied.) This question depends upon whether, in the Act of 1878, gross receipts within the State had (1) the meaning which *(a)* it had when the Act of 1878 was passed, under two decisions of this court construing the Act of 1872, and *(b)* it has had by unbroken practice for upwards of 60 years since or (2) any one of a thousand meanings which from time to time the tax-collectors may give it.

A mere tax statute may, of course, be amended or repealed at any time, either as to the rate or the base of the tax. Thus the general railroad gross receipts tax, which in 1878 was $\frac{1}{2}$ of 1 per cent., has been increased to a graduated rate of from $1\frac{1}{4}$ to $2\frac{1}{2}$ per cent. Code, 1943 Supplement, Art. 81, sec. 95 (a). The Act of 1878 was not a mere tax statute but a contract, by which the B. & O., *inter alia,* agreed to a modification of its charter exemption to a specified extent and *not otherwise.* This court has held, 30 years ago, that the Act of 1878 is "an irrepealable contract" (*State v. Baltimore & O. R. Co.,* 127 Md. 434, 450, 96 A. 636, 641), that "its object and purpose was to reach a final adjustment of matters in dispute between the state and the railroad, *not an adjustment of some and a leaving of others open and subject to future unknown modifications*" (127 Md. 449, 96 A. 641), that "there was no grant of any new right by the state to the railroad company, though there was a relinquishment of an existing right in return for which the state acquired a valuable right not theretofore possessed" (127 Md. 445, 96 A. 640). *State v. Baltimore & O. R.*

*Co.*, 127 Md. 434, 96 A. 636, 640. (Italics supplied.)

In *Erie Ry. Co. v. Pennsylvania*, 1875, 21 Wall. 492, 498, 22 L. Ed. 595, the gross receipts tax was apportioned "according to the length of the road within the State." In the *Delaware Railroad Tax Case*, 1874, 18 Wall. 206, 21 L. Ed. 888, the tax on "net earnings" was by statute likewise apportioned on a mileage basis. Counsel for the railroad company argued that this apportionment had the effect of taxing property beyond the State of Delaware, it being admitted that valuable terminals and other outside property were proportionately more valuable than the Delaware property. 18 Wall. 220, 221, 21 L. Ed. 888. The Supreme Court said: "The length of the whole road is in round numbers one hundred miles; the length in Delaware is twenty-four miles. The tax upon the property estimated according to this ratio would be in Delaware 24/100 or 6/25 of the amount of the tax upon the whole property. But the value of the property in Delaware is not 6/25 of the whole property, but much less than this proportion would require." Nevertheless the court held that the tax was not a property tax but a tax "upon the corporation itself," measured by a percentage of the value of "a certain proportional part" of its shares of stock, "a rule which, though an arbitrary one, is approximately just." 18 Wall. 231, 21 L. Ed. 888.

The Maryland Act of 1872, ch. 234, contained no express limitation to gross receipts within the State. The Act of 1874, ch. 408, amending the Act of 1872, provided for such limitation and for apportionment on a mileage basis. In *State v. Philadelphia W. & B. R. Co.*, 1876, 45 Md. 361, 24 Am. Rep. 511, counsel again argued that this was a tax on property outside the state, and that no apportionment was possible. This court said: "The only remaining point then to be considered, is the apportionment of the gross receipts liable to taxation, under the Acts of 1872 and 1874, and in regard to this, we are of the opinion that upon the pleadings and admitted facts in this case, the State is entitled to recover a sum equivalent to that part of the gross receipts, which may be in the same proportion to the whole amount of

gross receipts of the defendant, on its entire road from Baltimore to Philadelphia, that the number of miles of the Baltimore and Port Deposit Company bears to the whole number of miles of the Philadelphia, Wilmington and Baltimore Company, of which it forms a part. It is true the gross receipts on one part of the road may be greater than on another, but perfect equality in the assessment and apportionment of taxes is unattainable, and the rule we have adopted seems to be fair and reasonable. *Delaware Railroad Tax Case*, 18 Wall. 208, 21 L. Ed. 888." 45 Md. 384, 385, 24 Am. Dec. 511. In *State v. Baltimore & O. R. Co.*, 48 Md. 49, decided February 21, 1878, this court held that the gross receipts from roads built under the original charter of 1826 were exempt from taxation, but the receipts from the Metropolitan Branch, built until later acts, were not within the charter exemption. Concerning apportionment this court made the same decision as in the Philadelphia W. & B. case, *viz.*: "No separate account, however, has been kept of the receipts derived from this road, but it appears they were commingled with the receipts of the Main stem. Under such circumstances the only rule by which we can approximate to such receipts, is to say that they shall bear the same proportion to the entire gross receipts derived from the Main stem in the State, as the number of miles of the Metropolitan road bears to the entire length of the appellee's road."

On March 27, 1878, the Act of 1878 was passed. This contract of 1878 superseded, as to the B. & O., the Acts of 1872 and 1874. When the contracting parties used the term "gross receipts within this State," they used it with the same meaning the term "gross receipts" in the Acts of 1872 had been given by this Court twice, and by the legislature in the Act of 1874—apparently the only meaning any court or legislature had ever put upon such words. The words already construed by this court were adopted with their judicial construction. *Cf. Smith v. City of Baltimore*, 120 Md. 143, 87 A. 824.

In the instant case the opinion of this court, by calling the Act of 1878 an irrepealable contract, keeps the word

62

of promise to the ear, but breaks it to the hope by construing it to "produce the most beneficial results," *i. e.,* the most taxes, by methods foreign to the construction of contracts and to this court's previous construction of the contract or of terms of the contract. The opinion rests on two unwarranted assumptions, (1) that the Act of 1878 is a legislative grant, to be construed most favorably to the State and (2) that "it is undisputed that the line-mile method has been inadequate and unfair." Obviously the act could not be both a legislative contract (by which the taxpayer surrendered part of its tax exemption), to be given "a fair and liberal interpretation," and also a legislative grant, "to be construed most favorably to the State." Nor is it "undisputed that the line-mile method has been unfair," though the State apparently regards its contract as "inadequate" and seeks to escape it. It is impossible (if it were permissible) for hindsight to compare the expectations of the contracting parties in 1878 with the results after 60 years. The inexactness of mileage apportionment, or any other apportionment, was then as well known to the parties and to the courts as it is now. Assumption that every second track or side track doubles receipts has no more basis in fact than would an opposite assumption that such additional tracks have no value at all. The 1878 contract, *inter alia,* substituted a gross receipts tax for a passenger fare tax. At least during the second half of the 60 years after 1878, the relative receipts of passenger business, as compared with freight, greatly diminished. At all events, in 1878, "all-track" apportionment was as far from the thoughts and the words of the contracting parties as smoking cars for women or flying machines. Equally remote from the purpose or the words of the contract, or the decisions of this court, was the idea of delegating to the tax-collectors selection of any one, or a combination of more than one, of eight bases of apportionment varying to the extent of 300 per cent. between extremes.

In the lower court Judge Niles filed an able and comprehensive opinion, fully supported by reasoning and

authority. He read nothing into the contract beyond this court's previous construction of the contract or of terms of the contract. He quoted, *inter alia,* the following statement by this court in *State v. Baltimore & Ohio R. Co.,* 127 Md. 434, 439, 96 A. 636, 642: "The same rule of fair dealing which is enforced between individuals must be applicable where the parties are the state and a corporation having contractual relations with the state. The state can no more retain the benefits derived from its agreement and repudiate the benefits which are derived or to be derived by the other party to the contract, than can the individual."

The pecuniary stake in the instant case, though by 1878 standards substantial, will not make or break either party. The hope of the world lies largely in reviving and expanding observance of agreements among nations. If contracts between governments and their own taxpayers are not construed with candor and with due regard for precedents and practice of a life time, but to exact the uttermost farthing, agreements are "scraps of paper."